In the Matter of AMERICAN DENTAL COOPERATIVE, INC., Appellant, v ATTORNEY-GENERAL OF THE STATE OF NEW YORK, Respondent.

First Department, April 14, 1987

**APPEARANCES OF COUNSEL**

*Salvatore A. Romano* of counsel *(Joyce L. Bartoo* and *Melvyn R. Leventhal* with him on the brief; *Arent, Fox, Kintner, Plotkin & Kahn* and *Meister, Leventhal & Slade,* attorneys), for appellant.

*Elizabeth M. O'Neill* of counsel *(Lloyd Constantine* and *Alan Pfeffer* with her on the brief; *Robert Abrams, Attorney-General,* attorney), for respondent.

**OPINION OF THE COURT**

SULLIVAN, J. P.

This appeal presents the issue of whether New York may exercise long-arm jurisdiction over an out-of-State cooperative, suspected of being a participant in a conspiracy in restraint of trade affecting New York State residents and owned, in part, by New York member-dealers for which it regularly collects dues, consolidates purchase orders and pays bills. A secondary issue is whether the subpoena at issue is, as argued, overly broad and unduly burdensome.

American Dental Cooperative, Inc. (ADC), a Delaware corporation, is a purchasing cooperative for 30 "full service"[1] dental equipment and supply dealers, each of which is independently owned. Each member owns one share of ADC class A common stock and pays dues on a monthly basis. ADC does not have an ownership interest in any of its members. Nor does it control their financial or business operations, including sales and pricing. Four of ADC's members are located in New York. One, Mohawk Dental Supply Co., has three outlets within the State, while another, Norton Starr, Inc., has two. According to a 1985 directory, all of the dental equipment dealers in Utica and Syracuse are ADC members.

ADC's principal functions include consolidation of the members' purchases in order to qualify for manufacturers' discount programs; sponsorship and development of a line of private label products; promotional and educational activities for its members; and the preparation of a product information description book for their use. Although it orders goods and services for its members and pays the monthly bills, it does not distribute products in this or any other State.

ADC is not licensed to do business in New York and does not have a resident agent or maintain an office within the State. It has never kept a bank account or any corporate books or records or held meetings here. None of its employees resides in New York. It neither owns nor leases property in New York. Its president last visited New York in his representative capacity 3 or 4 years ago to attend a professional dental show.

Sometime in 1985 the Attorney-General of the State of New York began an investigation into allegations that certain

---

1. Full service dental products dealers maintain local showrooms and a sales and service staff and typically sell equipment for considerably more than do mail-order and discount dealers.

manufacturers and dealers were engaged in a conspiracy to fix prices and engage in a group boycott within the dental products industry in restraint of trade and competition in violation of New York's antitrust statute, General Business Law § 340 *et seq.* (the Donnelly Act). Preliminary investigation indicated that some full service dental products dealers had banded together to pressure manufacturers into refusing to sell to their lower priced competitors, such as discount and mail-order dealers. If these tactics succeeded, independent service organizations which install and maintain equipment purchased from mail-order dealers would also be driven out of business. Such activities constitute a per se violation of the Donnelly Act.

The two major commodities of the dental products industry are dental supplies, the consumable items used by dentists and replaced at frequent intervals (e.g., floss, burs), and dental equipment, such as X rays, dental chairs and delivery systems. Dentists generally purchase dental products from dealers, who buy them directly from the manufacturers. For years, two types of dealers serviced dentists' needs—full service dental products dealers, who also sell dental equipment, and mail-order dealers, who sell only supplies. Dental equipment was sold and serviced only by full service dealers. Sometime in 1979-1980, however, mail-order and small store discount dealers began to enter the dental equipment retail business. Usually, they were able to charge less for comparable equipment than were the full service dealers.

The Attorney-General alleges that he has received information indicating that full service dealers have conspired, in violation of the Donnelly Act and Federal antitrust laws, to pressure dental equipment manufacturers into refusing to sell to mail-order and discount dealers or selling to them on discriminatory terms. In particular, full service dealers are alleged to have organized the "D.O.M. movement", a boycott of all but "dealer-oriented manufacturers", i.e., manufacturers who sell only to full service dealers. In addition, some dealers who sell equipment under their own private label in competition with the major manufacturers have offered to reduce or eliminate their private label sales if the manufacturers confine their sales to only full service dealers. The Attorney-General has also received information tending to demonstrate that some dental equipment manufacturers have succumbed to this pressure and have agreed to maintain prices at a higher level. Such conduct will obviously reduce competition

in the dental equipment industry, and inevitably raise the costs of dental services to the ultimate consumers—the general public.

The Attorney-General has reason to believe that ADC is involved in the D.O.M. movement and may be participating in this alleged conspiracy on behalf of its members, including those domiciled in New York. The Attorney-General further believes that, irrespective of whether it is actually participating in the alleged conspiracy, ADC is likely to have information relevant to his investigation. Accordingly, in December 1985, he served ADC with interrogatories and a subpoena duces tecum, which was authorized by judicial order, issued ex parte, reciting that ADC was subject to service outside of the State pursuant to CPLR article 3.

ADC moved to quash a subpoena, arguing that it is not doing or transacting business in New York and therefore is not amenable to personal jurisdiction. ADC also argued that the investigation was not authorized since the Attorney-General had failed to meet the threshold requirements of section 343 of the General Business Law, and that the document request and interrogatories were unduly burdensome and overbroad. The motion court, citing the ex parte order authorizing out-of-State service, held that the jurisdictional question was beyond its power to review and declined to address the issue. Finding that the Attorney-General's investigation was statutorily authorized, and that the subpoena was neither overly broad nor unduly burdensome, it denied the motion. We affirm.

■ ■ The refusal of the court to consider the merits of ADC's jurisdictional challenge contravenes the clear and unambiguous language of section 343 of the General Business Law,[2] which explicitly provides a mechanism—a motion, pur-

---

2. General Business Law § 343, insofar as is relevant, provides: "Any person, persons, partnership, corporation, company, trust or association subject to service of a summons within or without the state pursuant to article three of the civil practice law and rules shall be subject to the service of a subpoena properly issued pursuant to this section. Any subpoena served hereunder without the state shall be issued on an ex-parte order of the court based upon a showing that the information or testimony sought bears a reasonable relationship to the subject matter under investigation * * * Any person, persons, partnership, corporation, company, trust, or association, who has been served with [a] subpoena pursuant to this section may make a motion, pursuant to section twenty-three hundred four of the civil practice law and rules, to quash, fix conditions, or modify such subpoena."

suant to CPLR 2304, to quash or modify—for testing the propriety of a subpoena issued pursuant to its provisions. *(See, Matter of Brunswick Hosp. Center v Hynes,* 52 NY2d 333, 339.) The evidence presented to the court, however, more than justifies its conclusion, however reached, that ADC is subject to this State's jurisdiction,[3] and that it must comply with the subpoena since the information sought is relevant to the subject matter of the investigation.

Turning to the latter issue first, we note that the Legislature has enunciated a strong public policy in New York in favor of free competition and has empowered the Attorney-General to bring civil suits under both State and Federal law and to institute criminal prosecutions to vindicate this policy. *(See, Columbia Gas v New York State Elec. & Gas Corp.,* 28 NY2d 117, 127; *Matter of Aimcee Wholesale Corp. [Tomar Prods.],* 21 NY2d 621, 625, 626.) In further implementation of this policy, the Attorney-General is authorized, pursuant to General Business Law § 343 and Executive Law § 63 (12), to conduct investigations into possible violations of the law. This investigatory power is a broad one. As the Court of Appeals has explained: "The Attorney-General has been given broad investigatory responsibilities to carry out his vital role to protect the public safety and welfare * * * and the government's interest in maintaining the Attorney-General's investigatory powers free from unnecessary hindrances takes on added importance * * * where he is acting in furtherance of this State's strong public policy in favor of promoting and protecting free competition." *(LaRossa Axenfeld & Mitchell v Abrams,* 62 NY2d 583, 589.) The investigatory power includes the right to issue subpoenas and serve interrogatories. *(See,* General Business Law § 343; Executive Law § 63 [12].)

As already noted, on the basis of information obtained from various industry sources, including confidential informants, the Attorney-General has reason to believe that certain dental products dealers, have, using D.O.M. as a code phrase, combined or conspired to eliminate discount and mail-order competition in violation of the law. Since the inception of the D.O.M. movement, of which ADC is alleged to be a leading proponent, several dental products manufacturers have ceased

---

3. An appellate court need not rely on the rationale articulated in the court of original jurisdiction to affirm a decision. *(See, Weissmann v Euker,* 1 AD2d 30, 35; *Mailloux v Spuck,* 87 AD2d 736, 737; 10 Carmody-Wait 2d, NY Prac § 70:423, at 693-695.)

doing business with mail-order and discount dealers or have announced their intention to do so.

■ The Attorney-General may issue a subpoena to the participants in a Donnelly Act violation, or "whenever he believes it to be in the public interest that an investigation be made" (General Business Law § 343). Contrary to ADC's arguments, all that the Attorney-General need show in support of his subpoena in the face of a motion to quash is his authority, the relevance of the items sought, and some factual basis for his investigation. *(Matter of Crowley Foods v Lefkowitz,* 75 AD2d 940, 941.) He is not required to demonstrate probable cause or disclose the details of his investigation. *(Matter of Hirschorn v Attorney-General of State of N. Y.,* 93 Misc 2d 275, 277, *affd* 63 AD2d 865.)* The subpoena will withstand challenge as long as the information sought bears a reasonable relationship to the subject matter under investigation and the public interest to be served. The Attorney-General may, as he offered to do here, proffer the factual basis for the investigation by an in camera showing, as well as by affidavit. Moreover, in evaluating the Attorney-General's justification for the issuance of a subpoena, there is a presumption that he is acting in good faith. *(People v Anaconda Wire & Cable Co.,* 19 AD2d 867; *Matter of Amos Post, Inc. v Attorney-General of State of N. Y.,* 70 AD2d 750, 751.) Thus, it is clear from this record that the subpoena seeks information relevant to a legitimate investigation.

■ Nor is there merit to ADC's jurisdictional argument. A foreign corporation is subject to personal jurisdiction if it is "doing business" in the State of New York. *(Tauza v Susquehanna Coal Co.,* 220 NY 259, 267; *see, International Harvester Co. v Kentucky,* 234 US 579, 587-588; *Simonson v International Bank,* 14 NY2d 281; CPLR 301.) Although an abstract test for determining the presence of a foreign corporation has never been articulated, if it is doing business here, "not occasionally or casually, but with a fair measure of permanence and continuity" it is within the jurisdiction of our courts. *(Tauza v Susquehanna Coal Co., supra,* at 267.) Whether the particular facts of this case establish a pattern of systematic, regular and continuous contact within the State of New York is an issue we need not reach, however, since a corporation may be subject to the jurisdiction of this State without doing business here. CPLR 302 (a) (1) provides that a court may exercise personal jurisdiction over a nondomiciliary as to a cause of action arising out of certain enumerated acts,

including "transact[ing] any business within the state or contract[ing] anywhere to supply goods or services in the state".

It is undisputed that more than 10% of ADC's members, for which it acts as a purchasing agent for the transmittal and billing of orders on a continuing basis, are located in New York. ADC also sponsors and develops private label products for its New York members and prepares and distributes product information books to them. In addition, its New York members must conform to ADC's bylaws, thus allowing it to exert influence over various aspects of their operation. In such circumstances, ADC is both transacting business and supplying services here. "It is important to emphasize that one need not be physically present in order to be subject to the jurisdiction of our courts under CPLR 302 for, particularly in this day of instant long-range communications, one can engage in extensive purposeful activity here without ever actually setting foot in the State." (Parke-Bernet Galleries v Franklyn, 26 NY2d 13, 17.)

ADC claims that CPLR 302 cannot serve as the basis for jurisdiction since there is no factual predicate demonstrating a "nexus between a cause of action against ADC and its transacting of business within the state or its contracting * * * to ship, distribute or supply goods or services within the state." In this connection, ADC argues that it is not a target of the Attorney-General's investigation. This assertion is without basis in the record and is made in the face of the Attorney-General's statement to the contrary. The cause of action in this matter is, of course, the suspected agreement to engage in a concerted refusal to buy from manufacturers who sell to discounters and mail-order dealers. Such an agreement would unequivocally violate the antitrust laws. ADC's alleged advocacy of a boycott of low priced competitors may be a service that it agreed to provide to its New York members, thus subjecting it to jurisdiction under CPLR 302 (a) (1). New York members regularly contribute dues to support these services.

Finally, and in any event, these activities, if proven, would constitute the common-law tort of restraint of trade, a wrongdoing which would have an injurious effect on consumers of dental products, mail-order dental products, discount dental products dealers and independent service organizations within the State. Such conduct, therefore, would bring ADC within the scope of CPLR 302 (a) (3), in that it "commit[ted] a

tortious act without the state causing injury to person[s] or property within the State".

The cases upon which ADC relies are inapposite. In *J. E. T. Adv. Assocs. v Lawn King* (84 AD2d 744), the court found that the services supplied to the New York franchisees of a foreign corporation had no connection to the plaintiff's breach of contract action regarding advertising services. Here, however, the very purpose of the subpoena is to determine whether the services provided by ADC to its members included an illegal effort to drive competitors out of business. The professional association cases *(Friends of Animals v American Veterinary Med. Assn.,* 310 F Supp 620; *Golf City v Wilson Sporting Goods Co.,* 555 F2d 426; *Academy of Ambulatory Foot Surgery v American Podiatry Assn.,* 516 F Supp 378), all involve Federal venue statutes, and stand for the proposition that the mere residency of some of the association's members in the district and their receipt of its publications there is too tenuous a connection to constitute transacting business, a principle which we endorse. Even with professional associations, however, it has been held that providing services which are a significant aspect of the organization's total operation constitutes "transacting business" in the place where those services are performed. *(Levin v Joint Commn. on Accreditation of Hosps.,* 354 F2d 515, 518; *Bogus v American Speech & Hearing Assn.,* 389 F Supp 327.)* The percentage of New York membership in ADC is significant as are the services provided to those members. The services ADC has admitted performing on behalf of its New York members clearly constitute a significant aspect of the over-all services it provides.

■ Finally, ADC asserts, in vague and conclusory terms, that the subpoena is overbroad and burdensome. It objects, *inter alia,* to the number of definitions, 29 in all, and subparts, as well as the six-year time frame that the subpoena covers. None of these objections, however, is sufficient to warrant quashing or modifying the subpoena in any way.

The validity of a subpoena, particularly in an antitrust investigation, turns on whether the material sought is relevant to the subject matter under investigation. "Only where the futility of the process to uncover anything legitimate is inevitable or obvious must there be a halt upon the threshold." *(Matter of Edge Ho Holding Corp.,* 256 NY 374, 382.) A subpoena is not rendered invalid merely because it requires production of a substantial number of documents. "[R]elevancy, and not quantity, is the test of the validity of a

subpoena." *(Matter of Minuteman Research v Lefkowitz,* 69 Misc 2d 330, 331.) Furthermore, courts do not demand absolute certitude in evaluating whether a particular subpoena seeks relevant information. Rather, "[a]ll that the issuer of an office subpoena need demonstrate in order to avoid a motion to quash is that the materials sought have 'a reasonable relation to the subject matter under investigation and to the public purpose to be achieved.' " *(Virag v Hynes,* 54 NY2d 437, 442, quoting *Carlisle v Bennett,* 268 NY 212, 217.)

The reason for this standard is obvious. An investigation would be stymied at the outset if law enforcement officials had to pinpoint exactly what the subpoenaed materials were expected to reveal. As the court explained in *Matter of Edge Ho Holding Corp. (supra,* 256 NY, at 381-382): "[A law enforcement official's powers] will be rendered to a large extent abortive if his subpoenas are to be quashed in advance of any hearing at the instance of unwilling witnesses upon forecasts of the testimony and nicely balanced arguments as to its probable importance. Very often the bearing of information is not susceptible of intelligent estimate until it is placed in its setting, a tile in the mosaic. Investigation will be paralyzed if arguments as to materiality or relevance, however appropriate at the hearing, are to be transferred upon a doubtful showing to the stage of a preliminary contest as to the obligation of the writ. Prophecy in such circumstances will step into the place that description and analysis may occupy more safely." *(Accord, Matter of La Belle Creole Intl. v Attorney-General of State of N. Y.,* 10 NY2d 192, 196; *Matter of Dairymen's League Coop. Assn. v Murtagh,* 274 App Div 591, 595, *affd* 299 NY 634 [subpoena must be upheld if it calls for information not "utterly irrelevant" to any proper inquiry].)

In this case, even a cursory comparison of the challenged discovery demands with the matters under investigation demonstrates that the test of relevance set forth in *Virag v Hynes* (54 NY2d 437, *supra)* has been satisfied. The Attorney-General is investigating whether certain dental products manufacturers and dealers have engaged in a concerted refusal to deal with certain manufacturers in an effort to drive mail-order and discount dental products dealers and others out of business. The challenged interrogatories clearly seek to obtain information relevant to that investigation. If a subpoena seeks information that is reasonably related to the subject matter of the investigation, then the subpoena must be upheld even though it places some burden upon the subpoena recipient.

Unable to controvert the Attorney-General's showing that the subpoena bears a reasonable relationship to the subject matter of the investigation, UDC suggests, *inter alia,* that the time frame of the subpoena be limited. The scope of a subpoena's demands turns on the nature of the investigation, however, rather than arbitrary time periods, or even the Statute of Limitations. *(Big Apple Concrete Corp. v Abrams,* 103 AD2d 609, 614-615.) As a result of his initial investigation, the Attorney-General believes that mail-order and discount dental products dealers first started competing in the dental equipment retail business sometime in 1979-1980. Thus, the investigation must go back at least to that time period to ascertain the response of the full service dealers and manufacturers to that competition and the impact, if any, of that response on pricing. In covering the period from January 1, 1980 to the present, the subpoena seeks information which is closely tied to events clearly relevant to the investigation and should not be limited in any way.

Insofar as ADC's claims that the instructions and definitions are too detailed are concerned, this court, in *Matter of Grandview Dairy v Lefkowitz* (76 AD2d 776, 777), a case upon which ADC relies, specifically approved similarly detailed instructions accompanying subpoena-interrogatories issued under General Business Law § 343.

Accordingly, the order of the Supreme Court, New York County (David H. Edwards, Jr., J.), entered on September 17, 1986, denying petitioner's motion to quash or modify respondent's subpoena should be affirmed, without costs or disbursements.

CARRO, ASCH, ROSENBERGER and SMITH, JJ., concur.

Order, Supreme Court, New York County, entered on September 17, 1986, unanimously affirmed, without costs and without disbursements.