*627 OPINION OF THE COURT
Walter B. Tolub, J.
This court is presented with what amounts to two very unique issues, one which is the subject of the instant application, and one which, while not formally made as part of the instant application, must nonetheless be addressed in order for this court to render a decision.
Petitioner is an entity known as the Pavillion Agency, Inc. Respondent is the Attorney General’s Office of the State of New York. By this application, Pavillion seeks an order from this court quashing or modifying the subpoenas duces tecum and ad testificandum dated April 5, 2005, and issued upon Pavillion by Eliot Spitzer, Attorney General of the State of New York. Alternatively, petitioner seeks a protective order pursuant to CPLR 3103 with respect to the aforementioned subpoenas.
Background
Pavillion, licensed to do business in the State of New York, is a domestic worker referral service. Simply put, Pavillion, through its four referral agents, consults with individuals seeking work as nannies, housekeepers, drivers, chauffeurs, maids, babysitters, etc., and refers them to private residences for job interviews based upon the individual needs of a family or homeowner. Pavillion does not charge any job applicant for its referral services, and any and all fees that may be due to Pavillion are paid entirely by the family or homeowner hiring the worker. More significantly, it is the family or homeowner hiring the domestic worker who is responsible for the direct payment of the domestic worker’s salary.
On December 10, 2004, the Attorney General’s Office served subpoenas duces tecum and ad testificandum (December subpoenas) upon Pavillion requesting the production of numerous documents[1] in connection with their business operations between January 1, 2004 and December 10, 2004. The Attorney *628 General contends that these subpoenas were justifiably issued after the Attorney General, as part of an investigation of the domestic worker placement industry, sent investigators posing as job applicants to several placement agencies, including Pavillion. The Attorney General’s position is that its investigations revealed that Pavillion “routinely inquired as to the national origin, age and marital status of job applicants and agreed to accommodate employer preferences with respect to the national origin and age of the domestic worker they sought to hire” (affirmation in opposition at 3) in contravention of Executive Law § 296 et seq. (the Human Rights Law), Civil Rights Law § 40-c, and Administrative Code of the City of New York § 8-107 (1) (a).
Pavillion responded to the December subpoenas, producing the majority of the requested information* [2] over a two-month period. In addition, on March 8, 2005, Pavillion produced Clifford Greenhouse, an officer of Pavillion, for deposition. Mr. Greenhouse’s deposition was conducted by various attorneys, affiliated with the Attorney General’s Office.
Although unclear from the papers, it appears that, following the deposition of Mr. Greenhouse, the parties attempted some form of settlement negotiations. When it became apparent that this matter was more likely to be headed for litigation, the Attorney General, on April 5, 2005, served Pavillion with a second subpoena duces tecum and a second set of subpoenas ad testificandum (the April subpoenas). The April subpoenas, which are the subject of this application, in addition to alleging that Pavillion had violated Executive Law § 296 et seq., Civil Rights Law § 40-c, and Administrative Code § 8-107 (1) (a), demanded additional business information for the time period spanning from April 1, 2002 until December 31, 2003, and sought the additional depositions of Pavillion employees Seth Greenberg, Ira Weissman, Sonia Nayyar, and Holly Rucki.[3]
The April subpoenas, similar to the December subpoenas, specifically requested the following information:
*629 “1. All applications, registrations, intake forms, requests or other documents used or designated to record information about Prospective Employers.
“2. All applications, registrations, intake forms, requests or other documents used or designed to record information about Applicants for Household Employment.
“3. All forms, notes[,] computer entries or other documents showing the identities of Applicants for Household Employment referred to Prospective Employers.
“4. Documents, including but not limited to billing invoices, sufficient to show all fees paid to [Pavillion] by Prospective Employers and the rate of salary or wages agreed upon for Applicants for Household Employment.
“5. To the extent not provided, all documents reflecting any preferences, job needs, attributes, characteristics or qualities desired or requested by a Prospective Employer of any Applicant(s) for Household Employment” (order to show cause, exhibit B).
By letter dated April 7, 2005, the Attorney General’s Office additionally demanded that Pavillion disclose the names and addresses of every prospective employer/client, contact detail that had been redacted from documents produced pursuant to the December 14, 2004 subpoena. The instant application, seeking to quash the April subpoenas and alternatively seeking a protective order to protect the identities of Pavillion’s clients, followed.
Discussion
As a primary matter, this court must first address Pavillion’s argument that the subpoenas in issue should be quashed because the Attorney General’s investigation is premised upon the allegation that Pavillion’s business activities somehow violate Executive Law § 296 et seq., commonly known as the Human Rights Law. Pavillion contends that the subpoenas should be quashed because the Attorney General, in failing to provide Pavillion with a complaint, procedurally failed to comply with Executive Law § 297, and has therefore denied petitioner due process. Pavillion further argues that, even if they had been properly served under Executive Law § 297, the subpoenas should still be quashed because domestic servants are specifically excluded from coverage under the Human Rights Law.
*630 Under both federal and New York state law, prospective employers are prohibited from discriminating against a prospective job applicant on the basis of a wide variety of factors,[4] including age, race, sex, color, disability and national origin (42 USC § 2000e et seq.; Executive Law § 296 et seq.). The laws also prohibit any individual from assisting any activity that would constitute a violation under the Human Rights Law (id.).
New York state law provides that, if a person believes that they are a victim of unlawful discriminatory practice, they are required to file a verified complaint with the State Division of Human Rights either on their own, or through their attorney (Executive Law § 297 [1]) in order to trigger an investigation into the alleged discriminatory practice. The complaint must include the name(s) and address of the individual or individuals committing the unlawful discriminatory practice complained of, and must include details of the alleged discriminatory act (id.). After filing a complaint, the Division of Human Rights serves the complaint upon the respondent and any necessary parties and commences an investigation into the allegations (Executive Law § 297 [2] [a]). Should the Attorney General wish to intervene on behalf of an individual or individuals it believes may be aggrieved parties under the Human Rights Law, it may also cause an investigation to be commenced by the Division of Human Rights—provided that it follows the same procedural requirements as set forth under the law.
Pavillion cannot, however, successfully advance the argument that they were denied due process because the Attorney General failed to comply with the procedural requirements of Executive Law § 297. Notwithstanding section 297, there is nothing prohibiting the Attorney General from commencing its own investigation into Pavillion’s business practices.
The Attorney General is given broad investigatory powers under section 63 (12) of the Executive Law which it may freely use whenever an individual or entity appears to have engaged in illegal and/or fraudulent business activities and/or practices under New York law (Executive Law § 63 [12]; Matter of Napatco, Inc. v Lefkowitz, 43 NY2d 884 [1978]; LaRossa, Axenfeld & Mitchell v Abrams, 62 NY2d 583 [1984]). As such, once the Attorney General’s Office suspects that Pavillion, or any other entities, might be engaged in some kind of discriminatory *631 employment practice which would be prohibited under state and federal laws, the Attorney General is within its right to commence an investigation independent of the Division of Human Rights, and notwithstanding the procedures enumerated in section 297. Moreover, once the Attorney General invoked its investigatory power, the presumption is that it did so in good faith, and was therefore not required to demonstrate probable cause or disclose the details of the pending investigation (Matter of American Dental Coop. v Attorney Gen. of State of N.Y., 127 AD2d 274 [1st Dept 1987]).
Pavillion’s second argument in support of quashing the subpoenas issued by the Attorney General focuses on the contention that, even if the Attorney General had properly served its subpoenas,[5] the subpoenas should still be quashed because domestic servants are specifically excluded from coverage under the Human Rights Law.
There is no question that domestic servants are excluded from coverage under the Human Rights Law (Executive Law § 292 [6]), and that the Legislature never intended “to extend its reach into private homes and to subject private employment relationships of the most personal kind to governmental control” (Matter of Thomas v Dosberg, 249 AD2d 999, 1000 [4th Dept 1998]). However, while an individual may choose to hire a domestic servant using whatever criteria he or she may desire, it is this court’s opinion that the privilege does not extend to an agent acting on behalf of a prospective employer; the privilege is personal to the employer. To rule otherwise would permit an employment agency to discriminate against prospective job applicants under the guise that they were merely filling the requirements[6] of the prospective employer, and would constitute *632 a violation under the Human Rights Law of this State.[7]
The remaining question, then, is whether the issued subpoenas in question are overbroad in their requests, and thus require either quashing, or alternatively, the issuance of a protective order.
In the application before this court, the April subpoenas issued by the Attorney General seek a number of documents that concern Pavillion’s business practices. Although there are five enumerated requests in the subpoenas, all of the information sought can be divided into two categories: information about Pavillion’s job applicants, and information about Pavillion’s clients. The latter request being reiterated by the Attorney General in their letter demand that Pavillion reveal the identity of its clients with respect to the information previously provided in response to the December subpoenas.
The Attorney General’s position on this matter is that they are entitled to all of the sought-after information because it is relevant to the investigation into whether Pavillion’s business practices are violative of the Human Rights Law. Pavillion argues to the contrary, focusing on the fact that as overburden-some as the request is, while the Attorney General may be entitled to much of the information it seeks, it is not entitled to know the identities of the clients to whom Pavillion refers its applicants.
As discussed earlier, the Attorney General possesses a broad investigative power pursuant to Executive Law § 63 (12). Notwithstanding the all-encompassing nature of these powers, and the presumption that the investigation was commenced in good faith, the issuance of any subpoenas must be supported by some factual basis (Napatco, 43 NY2d 884 [1978]), as it is relevancy, and not the quantity of material sought, that tests the validity of a subpoena (American Dental Coop., 127 AD2d 274 [1987]; Matter of Minuteman Research v Lefkowitz, 69 Misc 2d 330, 331 [Sup Ct, NY County 1972]). As long as the subpoena is factually supported and the information sought bears a reasonable and relevant relationship to the subject matter under *633 investigation, it is likely that, on a motion to quash, the subpoena will be upheld (Virag v Hynes, 54 NY2d 437, 441-442 [1981]; Matter of La Belle Creole Intl., S.A. v Attorney-General of State of N.Y., 10 NY2d 192, 196 [1961]; American Dental Coop., 127 AD2d 274 [1987]).
Of the five enumerated requests made by the Attorney General in the April subpoenas, the court notes that, although perhaps cumbersome to produce, the information sought pertaining to documents used or designed by Pavillion to record information about its job applicants is highly relevant to the investigative process. Equally relevant is documentation concerning fees earned by Pavillion for placing successful applicants, as well as the hiring rates for the successful applicants.
However, with respect to obtaining information about Pavillion’s clientele, it is this court’s opinion that the Attorney General is entitled only to information concerning Pavillion’s general registration or intake forms that it uses in connection with registering its clients, and those documents reflecting any job characteristics, requirements, and/or preferences that have been requested or desired by a prospective employer. The Attorney General is not, however, entitled to know who those prospective employers are. To allow the disclosure of that information would not only open the floodgates with respect to issues of client confidentiality and potential harassment, but it would effectively promote government interference with the most personal kind of employment relationships, which is exactly what the Legislature sought to prevent when it enacted the Human Rights Law over 50 years ago.[8]
*634 Accordingly, it is ordered that the portion of petitioner’s application seeking an order from this court quashing the April 5, 2005 subpoenas duces tecum and ad testificandum is denied; and it is further ordered that the portion of petitioner’s application seeking modification of the aforementioned April 5, 2005 subpoenas duces tecum and ad testificandum is granted to the extent that the respondent Attorney General is prohibited from obtaining information that would reveal the identities of any and all of petitioner’s clients seeking to employ individuals in the field of domestic service.

. The December subpoenas requested the following, including:
“1. All applications, registrations, intake forms, requests or other documents used or designed to record information about prospective employers.
“2. All applications, registrations, intake forms[,] requests or other documents used or designed to record information about Applicants for Household Employment.
“3. To the extent not provided, all documents reflecting any preferences, job needs, attributes or qualities desired or requested by *628 a Prospective Employer of any Applicant(s) for Household Employment. . .
“6. All documents used by [Pavillion] to train its employees including but not limited to training manuals, sample scripts, and/or sample documents” (order to show cause, exhibit A).

. Admittedly, while Pavillion produced a listing of prospective applicants to the Attorney General’s Office, Pavillion redacted the names of its clients, citing existing confidentiality agreements.

. The subpoena hearings for Sonia Nayyar and Holly Rucki were later voluntarily withdrawn.

. Indeed, Executive Law § 296 affords more protection than present federal law, also prohibiting discrimination on the basis of sexual orientation, military status, or marital status.

. And this court, based on earlier discussion, sees no reason as to why the subpoenas would not have been properly served.

. Clearly, there are many types of legitimate hiring criteria involved in the hire of domestic service positions, and these criteria vary greatly depending on the needs of the household and the type of position to be filled. For example, the criteria utilized for hiring someone to take care of an elderly relative are bound to be vastly different from the criteria used to fill a position for a nanny, housekeeper, or personal driver. The point this court seeks to make is that an individual or family seeking to fill a domestic service position is free to utilize whatever criteria they feel necessary in order to hire someone who is competent at what they do, and someone who they are comfortable with putting in charge of their most personal needs, and the most personal needs of others in their household. An employment agency, however, is barred from filling a domestic service position on behalf of that individual or family using anything other than legitimate hiring criteria in their screening process.

. This court’s decision is additionally guided by cases involving litigation against newspaper publishers: State Div. of Human Rights v Binghamton Press Co. (67 AD2d 231 [4th Dept 1979] [newspaper that publishes palpably discriminatory advertisement constitutes an unlawful discriminatory practice under section 296]); National Org. for Women v Evening Sentinel (1973 WL 2709 [Conn Ct Com PI 1973] [organization of classified ads according to gender of employee sought held to constitute unfair employment practice]).

. Aptly discussed in Thomas, the Appellate Division, Fourth Department, noted that
“[t]he origin of the Human Rights Law is the Law Against Discrimination, which was drafted by the New York State Temporary Commission Against Discrimination (Temporary Commission) and enacted in 1945 (L 1945, ch 118 [Executive Law former art 12]). That law also addressed discrimination in the workplace and exempted ‘any individual employed ... in the domestic service of any person’ from its provisions (Law Against Discrimination, Executive Law former § 127 [6]). The Temporary Commission explained in its report that ‘[t]he exception of personal relationships in homes . . . avoids intrusions which would stimulate resentment, stultify enforcement and risk various constitutional inhibitions’ (Report of NY State Temp Commn Against Discrimination, 1945 NY Legis Doc No. 6, at 28).” (Thomas, 249 AD2d at 1000.)