OPINION OF THE COURT
Bernard J. Fried, J.
This petition was brought by the Attorney General of the State of New York pursuant to CPLR 2308 (b) to compel compliance with his subpoena dated January 27, 2009, issued to John A. Thain, former Chief Executive Officer (CEO) of Merrill Lynch & Co., Inc. The Attorney General issued the subpoena to Thain under the authority of the Martin Act (General Business Law § 352 et seq.) and Executive Law § 63 (12), as part of his investigation into the timing, propriety, and disclosure of $3.6 billion in bonus payments made by Merrill Lynch on the eve of its merger with Bank of America Corporation. Thain refused to answer certain questions during his February 19, 2009 deposition, and the Attorney General brought this petition seeking an order directing Thain to answer his questions.
Pursuant to a so-ordered stipulation dated February 23, 2009, Thain has now complied with the subpoena; he answered the questions at a February 24, 2009 deposition. Pursuant to the February 23 stipulation, however, the parties agreed that Thain’s testimony would remain confidential pending my decision on the proposed motion to intervene in this action by Bank of America and Merrill Lynch (collectively, for ease of reference, *380 the intervenors), which I authorized. The intervenors have now filed that motion for leave to intervene, pursuant to CPLR 1012 (a) (2) and 1013, and oral argument took place on March 13, 2009.
The Attorney General’s Authority Under the Martin Act
The Martin Act states that the Attorney General, whenever it appears that any person has engaged in fraudulent practices or “he believes it to be in the public interest that an investigation be made, . . . may in his discretion” commence an investigation. (General Business Law § 352 [1].) The Attorney General may “require such other data and information as he may deem relevant and may make such special and independent investigations as he may deem necessary in connection with the matter.” (Id.) To that end, he is “empowered to subpoena witnesses, compel their attendance, examine them under oath . . . and require the production of any books or papers which he deems relevant or material to the inquiry” (§ 352 [2]).
In conducting his investigation, “the Attorney-General acts as an executive official performing an administrative duty.” (Carlisle v Bennett, 268 NY 212, 217 [1935].) Consequently, the Attorney General’s “discretion must be exercised within bounds circumscribed by a reasonable relation to the subject-matter under investigation and to the public purpose to be achieved.” (Id.) Moreover, “the witness subpoenaed has the right to secure an adjudication as to whether that limit has been exceeded.” (Id. at 218.)
But “once the Attorney General [has] invoked its investigatory power, the presumption is that it did so in good faith, and [i]s therefore not required to demonstrate probable cause or disclose the details of the pending investigation.” (Matter of Pavillion Agency, Inc. v Spitzer, 9 Misc 3d 626, 631 [Sup Ct, NY County 2005], citing Matter of American Dental Coop. v Attorney-General of State of N.Y., 127 AD2d 274 [1st Dept 1987] [rejecting challenge to Attorney General’s Donnelly Act subpoena issued pursuant to General Business Law § 343].) “[A]ll that the Attorney-General need show in support of his subpoena in the face of a motion to quash is his authority, the relevance of the items sought, and some factual basis for his investigation.” (American Dental Coop., 127 AD2d at 280.)
Section 63 (12) of the Executive Law directs that “[t]he attorney-general shall . . . apply . . . for an order enjoining” repeated acts of fraud or illegality “in the carrying on, conducting or transaction of business,” and authorizes him, “[i]n con *381 nection with any such application, ... to take proof and make a determination of the relevant facts and to issue subpoenas in accordance with the civil practice law and rules.”
There is no dispute that the Attorney General has the authority to conduct this investigation. (Oral argument transcript at 5-6 [Mar. 13, 2009].) The information he is seeking about employee bonuses is unquestionably related to the subject matter under investigation and the public purpose to be achieved. Therefore, it is within his Martin Act authority.
In any case, the intervenors do not challenge the scope of his investigation. (Transcript at 6.) The intervenors have limited their challenge to a single legal issue: “whether or not disclosures regarding certain employee compensation information should be kept confidential.” (Intervenors’ brief at 18; see also transcript at 6.)
Intervention as of Right Under CPLR 1012 (a) (2)
The intervenors claim that they have a right to intervene in this action, under CPLR 1012 (a) (2), in order to seek an order preventing the Attorney General from publicly disclosing the names of the Merrill Lynch employees who received certain bonus amounts in December 2008. The intervenors claim that this information is private and a trade secret.
CPLR 1012 (a) (2) provides that a person is “permitted to intervene in any action . . . [w]hen the representation of the person’s interest by the parties is or may be inadequate and the person is or may be bound by the judgment.”
“Whether a movant ‘will be bound by the judgment within the meaning of [CPLR § 1012 (a) (2)] is determined by its res judicata effect.’ ” (Matter of Tyrone G. v Fifi N., 189 AD2d 8, 17 [1st Dept 1993], quoting Vantage Petroleum, Bay Isle Oil Co. v Board of Assessment Review of Town of Babylon, 61 NY2d 695, 698 [1984].)
The intervenors argue that they will be “bound” by any ruling on the Attorney General’s petition because they will not have “any effective remedy to prevent [sic] their legitimate interest in maintaining the confidentiality of their employees’ compensation amounts.” (Intervenors’ brief at 17; see also transcript at 48.)
The intervenors’ argument goes beyond the meaning of “bound” under section 1012 (a) (2). The Attorney General filed this petition to enforce his subpoena issued to Thain. The action before me is not a plenary action seeking a final judgment. *382 In fact, the intervenors conceded at oral argument that there will be no final judgment in this action that could bind them. (Transcript at 48.) There will be no “judgment” within the meaning of section 1012 (a) (2).
Moreover, intervention in a Martin Act investigation by-private parties has specifically been disapproved by the Court of Appeals. (See People v Bunge Corp., 25 NY2d 91, 97-101 [1969]; see also Matter of Attorney-General of State of N.Y. v Katz, 104 Misc 2d 846, 851 [Sup Ct, NY County 1980] [denying motion for leave to intervene in Martin Act investigation, where “ (intervention might well constitute an infringement on the confidential, discretionary investigation conducted by the Attorney-General”].) Accordingly, section 1012 (a) (2) does not authorize intervention in an action that is just a petition to compel compliance with a subpoena issued as part of a Martin Act investigation — particularly where, as here, the intervenors are not parties to that subpoena. Consequently, I reject the intervenors’ argument that they are entitled to intervene as of right under CPLR 1012 (a) (2).
In addition, and as an alternative basis for my decision, I reject the intervenors’ argument that they have a legally protectable interest in this action, such that they have a right to intervene to protect the confidentiality of the compensation information.
The intervenors interpose two theories supporting their argument that they have an interest to protect in this action. The first seems to be based on general privacy concerns, and the second is based on the common law of trade secrets.
The Martin Act provides that “[a]ny officer participating in [an] inquiry and any person examined as a witness . . . who shall disclose to any person other than the attorney-general. . . any . . . information obtained upon such inquiry except as directed by the attorney-general shall be guilty of a misdemean- or.” (General Business Law § 352 [5] [emphasis added].)
New York courts have interpreted this language as “tantamount to authority in the Attorney-General to direct whether the inquiry in its entirety shall be secret or public.” (Matter of Marcus, 139 Misc 675, 680 [Sup Ct, NY County 1931], affd 232 App Div 731 [1st Dept 1931] [rejecting petitioners’ argument that they could insist upon secrecy in the course of Attorney General’s investigation of fraudulent practices by a bank].)
For example, the First Department in Seligson v Fidelity & Cas. Co. of N.Y. (36 AD2d 919 [1st Dept 1971], affd 29 NY2d *383 828 [1971]), in reaching its conclusion that the Attorney General could not selectively disclose information obtained in a Martin Act investigation to one party in a litigation and not to the other party, affirmed the Attorney General’s power to choose whether or not to disclose the information in the first place. The Court stated: “we derogate in no way from the undisputed right and power of the Attorney-General to hold as confidential evidence collected by him in a Martin Act investigation, if he so chooses.” (Id. at 920 [emphasis added]; see also Sittniewski v Decker, 134 Misc 2d 177, 179 [Sup Ct, Erie County 1986], affd 140 AD2d 965 [4th Dept 1988] [noting that “Attorney-General ha(s) the discretion to disclose information he gather(s) in a Martin Act investigation”].)
The case law is uniform that the Martin Act vests in the Attorney General the authority to decide whether the information he gathers as part of his investigation should be kept secret or public.
In support of their counterargument, the intervenors rely chiefly on case law discussing protective orders governing the production of personnel files or tax returns in the course of litigation between private parties.[1] They have cited no case law involving compliance with a Martin Act subpoena or supporting their argument that they have a privacy interest in compensation information that outweighs the Attorney General’s statutory authority to decide whether to keep that information secret.
The principal decision outside the discovery context cited by the intervenors is Equal Empl. Opportunity Commn. v Morgan Stanley & Co. (132 F Supp 2d 146 [SD NY 2000]), in which a federal court recognized limits to the investigative powers of the Equal Employment Opportunity Commission (EEOC). That decision did not involve the Martin Act, but a provision of title VII of the Civil Rights Act of 1964 (42 USC § 2000e-8 [e]), the EEOC’s governing statute, which expressly subjects EEOC staff to criminal penalties for making information obtained pursuant to the EEOC’s subpoena power “public in any manner whatever,” before having instituted proceedings involving that information. (132 F Supp 2d at 154.) This decision is wholly distinguishable, because the court rested its decision not on general principles of *384 privacy and confidentiality, which it discussed in dicta, but on an express provision of title VII. (Id.)
The intervenors also argue that this information deserves trade secret protection.
A trade secret is “any formula, pattern, device or compilation of information which is used in one’s business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.” (Ashland Mgt. v Janien, 82 NY2d 395, 407 [1993].) Whether or not certain information is a trade secret depends on several factors:
“(1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.” (82 NY2d at 407 [citations and internal quotation marks omitted].)
“As these considerations demonstrate, a trade secret must first of all be secret: whether it is is generally a question of fact.” (Id.)
In support of its trade secret claim, Bank of America has submitted evidence that Bank of America employees are asked or requested to keep their compensation confidential “in the workplace,” and most do. (Ryan aff ¶ 6; accord id. ¶ 8.) Bank of America’s sample 2008 Compensation Statement requests employees: “We ask that you keep your compensation confidential.” (Sado aff, exhibit C.)
But there is no evidence that Bank of America enforced this request. Indeed, Kenneth Lewis, CEO of Bank of America, testified at his deposition in this investigation that he did not know if Bank of America even had a policy requiring employees to keep their compensation confidential. (Mahon aff, exhibit D, at 137-138.) A member of Bank of America’s Human Resources department testified that he did not know if employees had to sign a confidentiality agreement with respect to their compensation information, and he was unaware of any occasion in which the Bank of America had ever attempted to enforce such a policy by firing an employee for disclosing such information. (Mahon aff, exhibit O, at 69.)
*385 The record also does not demonstrate that Merrill Lynch took measures to keep compensation information secret. In his February 24 deposition, Thain testified that he was unaware of any Merrill Lynch policy prohibiting employees from disclosing their compensation, and he admitted that employees disclosed such information routinely. (Mahon aff, exhibit N, at 216.)
A few Merrill Lynch documents submitted by the intervenors characterize compensation information as “proprietary” or “confidential,” but these documents, too, do not indicate that Merrill Lynch takes measures to keep this information secret. A document called “January 1, 2009 Guidelines for Business Conduct” states that employees are obligated to protect Merrill Lynch’s “proprietary information,” which includes “salary and bonus information.” (Sado aff, exhibit G, at 7.) Protecting employee compensation information from disclosure, however, is not specifically mentioned among employees’ “Confidentiality Obligations” in the same document. (Id. at 4-5.) Another Merrill Lynch document, entitled “Information Security & Privacy,” lists “compensation information” as an example of “confidential information.” (Sado aff, exhibit H, at 6507-6508.) This document, however, goes on to list examples of the “most sensitive” kinds of confidential information, such as medical history or Social Security number; “compensation information” is not among them. (Id.)
Furthermore, nothing in the record suggests that Bank of America or Merrill Lynch employees are not permitted to discuss their compensation with potential new employers or headhunters. Indeed, the intervenors’ counsel conceded at oral argument that it was “absolutely not” improper for employees to disclose their compensation to a prospective employer. (Transcript at 51-52.)
In addition, it does not appear that Bank of America employees had an expectation of privacy in their compensation information. Bank of America’s “U.S. Associate Privacy Policy,” which lists “compensation information” as a type of “Confidential Associate Information” that is “intended for limited disclosure on a need-to-know basis,” provides: “Bank of America does share confidential and proprietary associate information, as allowable and as required by law, under limited circumstances, such as responding to subpoenas issued by governmental agencies.” (Sado aff, exhibit E, at 1, 2.) Even the privacy policy states that employees can expect compensation information to be disclosed in response to government subpoenas.
*386 In summary, the evidence does not show that Bank of America requires its employees to keep their compensation confidential; it shows at most that Bank of America has a policy of encouraging or asking employees not to talk about their compensation in the workplace. The record indicates that Bank of America has not taken the kind of measures to protect the secrecy of its employee compensation information that one would expect it to have taken if this information were a trade secret.
It is evident that, while employees of Bank of America and Merrill Lynch may be discouraged from disclosing compensation information, particularly in the workplace, employees disclose this information freely to third parties, and the intervenors have never taken any measures to prevent that disclosure.
The intervenors insist, however, that, even if all the individual employees’ compensation information is not secret, the compensation of all 200 top earners as a group is a trade secret, since Bank of America tries to “limit” the number of people within the company who know other employees’ compensation. (Ryan aff ¶¶ 6-7; transcript at 50, 52-53.)
I reject this argument; while the intervenors might prefer that information about employee compensation not be widely known within the company, there is no evidence that the intervenors have ever taken measures to prevent employees from sharing compensation information with third parties or to enforce their purported privacy policies, either with respect to individual compensation or to employee compensation in the aggregate. The record also does not support their assertion that this information is inordinately valuable to competitors. While the intervenors’ counsel asserted at oral argument that the public disclosure of compensation information would allow competitors and headhunters to target potential candidates for recruitment more easily (transcript at 50-51), the intervenors concede that they do not try to prevent employees from sharing this information directly with their competitors. On this record, the intervenors’ argument falls considerably short of establishing that the compensation information, even in the aggregate, is a trade secret under the Ashland test.
The intervenors also argued that, if employees are worried that Bank of America cannot protect their privacy, they will leave, and Bank of America will lose valuable employees to competitors. (Transcript at 54.) The employees can have had no reasonable expectation of privacy in this information, when *387 they themselves are free to share it with third parties, and Bank of America’s own privacy policy states that this information may be shared with the government. But even assuming that the employees’ expectation of privacy were reasonable, an expectation of privacy is not one of the Ashland factors.
Much of the case law cited by the intervenors for the contrary proposition concerns protective orders in the discovery context; none of their holdings are relevant to a Martin Act investigation.[2] Other cases cited by the intervenors in support of their trade secret claim do not stand for the principles of law for which they have been cited; they are either mischaracterizations of dicta as holdings or preliminary findings about a likelihood of success on a preliminary injunction application.[3] The court’s decision in Dibble v Penn State Geisinger Clinic, Inc. (806 A2d 866 [Pa Super Ct 2002]) is distinguishable both in its procedural posture and on its facts; there, the defendant in a medical malpractice action was entitled to a confidentiality order concerning discovery documents, since it had shown that it had undertaken legal steps and incurred expense “to guard the secrecy of the information at issue.” (Dibble, 806 A2d at 871.) As discussed supra, the intervenors have not made that showing here.
In conclusion, the intervenors have no legally protected interest in the confidentiality of the compensation information that would entitle them to intervene as of right in this action.
Permissive Intervention Under CPLR 1013
CPLR 1013 provides:
“Upon timely motion, any person may be permitted to intervene in any action when a statute of the state confers a right to intervene in the discretion of the court, or when the person’s claim or defense and the main action have a common question of law or fact. In exercising its discretion, the court shall consider whether the intervention will unduly delay the determination of the action or prejudice the substantial rights of any party.”
Even assuming that the intervenors’ proposed petitions shared a common question of fact or law with this action, I *388 would not exercise my discretion to permit them to intervene. The confidentiality order sought by the intervenors would delay the investigation by requiring the Attorney General to come to court to ask for permission before he could disclose any of the information at issue. (Transcript at 20-23.) Furthermore, disallowing intervention would not prejudice the substantial rights of Bank of America, since it has no right to insist that the Attorney General conduct his investigation in secret or otherwise to intervene in the investigation.
Therefore, I decline to permit intervention under CPLR 1013.
The Intervenors’ Proposed Petitions to Modify and for a Protective Order
The intervenors have attached to their motion papers a document entitled: “Petition to quash, fix conditions or modify subpoena pursuant to CPLR. § 2304.” In their motion papers, the intervenors have also discussed their anticipated petition for a protective order, pursuant to CPLR 3103. (Intervenors’ brief at 11-15; petition ¶ 4.)
Although I did not authorize these petitions to be filed or briefed, the parties have extensively briefed the merits of both of them and argued their merits at oral argument. While the intervenors initially took the position that their arguments “should not be interpreted as a full briefing on the merits of the proposed petition to modify or the expected forthcoming Motion for a Protective Order” (intervenors’ brief at 1), counsel for the intervenors agreed with me during oral argument that the merits of the question of “whether or not this is confidential or protectable information” — the heart of the proposed petitions— are before me in this motion. (Transcript at 8-9, 36-37.) Furthermore, counsel for the intervenors did not raise any objection when counsel for the Attorney General asked me, at oral argument, to rule on the merits of the petitions, as well as the motion to intervene. (Transcript at 36-37.) Indeed, counsel for the intervenors continued to argue the merits of the petitions after that time. (Transcript at 49-55.) And neither party has asked me to deny the petitions as outside the scope of this action, to the extent that they concern the Attorney General’s subpoena to Bank of America or to anyone else other than Thain.
Consequently, in the interests of judicial economy, but without deciding that these petitions were properly filed in this action, I *389 turn to the merits of the proposed petitions to modify and for a protective order.[4]
The petitions concern not only the January 27, 2009 subpoena issued to Thain, but also a February 26, 2009 document subpoena issued to Bank of America by the Attorney General, as part of the same investigation. The Bank of America subpoena requested, among other things, a list of Bank of America’s bonus recipients. Bank of America had already agreed to produce a list of its 200 highest bonuses, but it had refused to provide the names of the persons who received each bonus amount. The Attorney General had offered to enter into its standard confidentiality agreement, in which it would voluntarily impose certain limitations on its use of the information, but Bank of America refused.
The petition to modify seeks an order fixing a confidentiality condition on both the Thain and Bank of America subpoenas, as well as an order modifying “any other subpoenas issued by the Attorney General’s Office in relation to the [sic] its investigation” so as to keep confidential any information linking bonus amounts to the names of the persons who received them. (Petition at 11-12.) The proposed petition for a protective order would seek an order protecting from public disclosure the names, positions, and corresponding compensation amounts for Merrill employees who received bonuses in 2008, if that information is provided to the Attorney General “in accordance with any current or future subpoena.” (Petition ¶ 4.)
I have reviewed the arguments on both sides, and I conclude that the proposed petitions to modify and for a protective order have no merit.
Unlike Matter of Pavillion Agency, Inc. v Spitzer (9 Misc 3d 626 [2005]), in which the court decided that certain information sought by the Attorney General was irrelevant to his investigation into Human Rights Law violations (id. at 633-634), here the intervenors’ counsel conceded at oral argument that the information sought by the Attorney General is relevant to his investigation. (Transcript at 5-6, 16-17.) The intervenors *390 have limited their request for relief to limit the disclosure of that information.[5] 6 (Transcript at 17.)
As discussed, the Martin Act vests in the Attorney General the discretion to decide whether to keep the information that he gathers in the course of his investigation secret or public. The intervenors have no cognizable privacy interest that undermines that statutory discretion. The record does not support the intervenors’ claim that the employee compensation information is a trade secret. Consequently, I conclude that there is no legal basis for the proposed petitions to quash, fix conditions or modify the subpoena and for a protective order.
In accordance with the foregoing, it is ordered that the motion to intervene is denied.

. E.g. ADL, LLC v Tirakian, 2007 WL 1834517, 2007 US Dist LEXIS 46198 (ED NY, June 26, 2007); Estate of Gonzalez v Hickman, 2006 WL 3201069, 2006 US Dist LEXIS 83103 (ED Cal, Nov. 6, 2006), revd, on reconsideration 466 F Supp 2d 1226 (ED Cal 2006); Russell v Del Vecchio, 764 F Supp 275 (ED NY 1991).

. E.g. Mann v Cooper Tire Co., 33 AD3d 24 (1st Dept 2006); McLaughlin v G. D. Searle, Inc., 38 AD2d 810 (1st Dept 1972).

. E.g. Plasmanet, Inc. v Apax Partners, Inc., 6 Misc 3d 1011(A), 2004 NY Slip Op 51769(U) (Sup Ct, NY County, Nov. 22, 2004); Doubleclick Inc. v Henderson, 1997 WL 731413, 1997 NY Misc LEXIS 577 (Sup Ct, NY County, Nov. 7, 1997); EarthWeb, Inc. v Schlack, 71 F Supp 2d 299 (SD NY 1999).

. The intervenors suggest that, if they are not permitted to intervene, they will “commence a separate proceeding to seek a judicial determination of the exact same legal issues,” citing Jiggetts v Dowling (21 AD3d 178 [1st Dept 2005]). (Intervenors’ brief at 19.) In these circumstances, in which the parties have briefed and argued the issues in the proposed petitions, and they have represented at oral argument that both petitions are substantively before me, I need not wait for a separate proceeding to address their merits.

. In any case, the court in Pavillion did not appear to rest its decision on CPLR 3103 — the alternative ground for relief argued by the petitioner — so this decision does not, in any case, support the intervenors’ motion for a protective order (cf. intervenors’ brief at 15; see Pavillion, 9 Misc 3d at 634).