Rhoda DIBBLE, Individually and
as Executrix of the Estate of
Charles Dibble, Appellee,

v.

PENN STATE GEISINGER CLINIC,
INC. d/b/a Geisinger Medical Group,
Geisinger Health Plan, Penn State
Geisinger Health Systems, Inc., Dr.
Gregory J. Fino, Dr. Matthew Conne-
ly, Seth W. Fisher, M.D., Geisinger
Wyoming Valley Medical Center,
Geisinger Medical Center, Dr. Robert
Scalia, D.O., Charles A. Laubach, Jr.,
M.D. and Dr. James Blankenship, Ap-
pellants.

Superior Court of Pennsylvania.

Argued Dec. 12, 2001.
Filed May 16, 2002.
Reargument Dismissed June 7, 2002.

David E. Manoogian, Washington, and Daniel T. Brier, Scranton, for Geisinger Clinic, appellant.

Kevin P. Foley, Scranton, for appellee.

Before CAVANAUGH, STEVENS and BECK, JJ.

CAVANAUGH, J.

¶ 1 This is an appeal from the denial of a motion for a confidentiality order presented by defendants, the Geisinger Health Plan HMO and certain of its participating health care providers, which sought to prevent plaintiff from disclosing, disseminating and/or otherwise publishing numerous pages of documents that the defendants produced during discovery conducted in an underlying medical malpractice action. The documents pertained to the HMO's managed care procedures, and included, *inter alia,* information regarding individual physicians' compensation, HMO salary/bonus incentive procedures as well as policies regarding the hiring and retention of plan physicians. After producing the documents, defendants sought plaintiff's agreement to keep the information confidential. Plaintiff's counsel declined to execute the proposed confidentiality agreement. Rather, he stated his intention was to use the information produced in the instant lawsuit to support his firm's prosecution of several unrelated lawsuits against the HMO and to exchange the information produced with outside attorneys and law firms engaged in unrelated actions against the HMO. Thus, in late August of 2000, defendants sought a confidentiality order from the trial court, in part on the grounds that the records produced included proprietary trade secrets and that the documents contained information entitled to protection under a constitutional right to privacy. On January 3, 2001, as part of a "general housekeeping order" to dispose of "various outstanding issues in this involved and complex litigation" the trial court summarily denied, among other things, "Defendants Petition for an Order of Confidentiality." Defendants now appeal the order denying relief as separable from and collateral to the main cause of action pursuant to Pa.R.A.P. 313 and allege that the trial court erred in denying the petition.[1] We agree and accordingly, we reverse.

¶ 2 The facts, as gleaned from the record, show that in 1987, plaintiff husband, Charles Dibble, became eligible for Medicare. In 1990, he purchased a "Medicare wrap around" supplemental health insurance plan from appellant Geisinger Health Plan. The HMO coverage was a supplement to the traditional Medicare "fee for service" plan which was the primary payor for Mr. Dibble's health care treatment.

1. The record has been ordered sealed by this court pending resolution of the appeal.

¶ 3 Mr. Dibble was hospitalized for a heart attack in January of 1994. While in the hospital, a digital rectal examination showed an enlarged prostate and a prostate specific antigen (PSA) blood test revealed a slight elevation.[2] The hospital discharge summary noted the findings of enlarged prostate and elevated PSA. Mr. Dibble saw his primary care physician a number of times after January of 1994 complaining of increased frequency and difficulty in urinating but no follow-up PSA was ordered until July of 1996. By that time, plaintiff's PSA levels were greatly elevated. In October of 1996, plaintiff was referred to a urologist. An ultrasound and a further elevated PSA confirmed the presence of prostate cancer.

¶ 4 Mr. and Mrs. Dibble sued the primary care physician, the primary care physician's group, the individual doctors in the group and the HMO for, *inter alia,* failure to timely diagnose cancer.[3] Paragraphs 39, 99, 100 and 102 of the complaint alleged that the primary care physician and his group had a financial incentive to hold down the number of patient referrals to specialists. The complaint alleged that the physicians received cash bonuses from the HMO for minimizing the number of tests, treatments and referrals and that the defendant physicians intentionally limited the amount of medical care Mr. Dibble received to further their own financial interests.

¶ 5 During discovery, plaintiff requested the production of all relevant documents showing agreements between the doctors and the HMO, including data on physician salaries and incentive bonuses. Defendants moved for a protective order, claim-

ing that the information was privileged and non-discoverable. The motion was denied and the defendants complied with a court order compelling production. The order at issue herein, denying the subsequent request for confidentiality, was entered on January 3, 2001.

¶ 6 In May, 2001, in exchange for keeping a scheduled trial date of July 9, 2001, plaintiff agreed to drop all claims regarding physicians' salaries, incentive compensation and managed care. The parties stipulated that paragraphs 39, 99, 100 and 102 would be stricken from the amended complaint and the trial court entered an order of partial dismissal based on the stipulation.

¶ 7 It appears that the parties subsequently reached a settlement regarding the negligence claims and there are no substantive issues before us concerning the underlying action. However, despite apparent resolution of the underlying lawsuit and the fact that there is no longer any discernable relevance to the documents regarding physician compensation or managed care due to, among other things, dismissal of the claims to which the documents pertained, plaintiff's counsel will not agree to the confidentiality of the documents which are apparently still in his possession. The record and our research reveal that several other lawsuits raising issues of financial incentives to physicians to limit treatment have been brought in Lackawanna County against the Geisinger Health Plan HMO and its clinics and providers. Instant plaintiff's counsel will not agree to limit use of the discovery in this case to the seemingly completed prosecution of this case, but proposes to use it in

---

2. The PSA test is a predictor for prostate cancer.

3. During the course of the pre-trial litigation, Mr. Dibble passed away and Mrs. Dibble was

substituted as the sole plaintiff, both individually and as the executrix of Mr. Dibble's estate.

the attempt to establish liability in other cases. It is clear to this court that the attorneys on both sides of this dispute have allowed their differences of opinion to become inflexible and have allowed the discovery battles in this and other ongoing, unrelated actions to devolve into a mutual and personal distrust for each other that clearly borders on loathing and vituperation.[4]

¶ 8 Following apparent settlement of the underlying lawsuit, a praecipe for discontinuance was entered on November 15, 2001. On December 5, 2001, appellant HMO filed a praecipe to strike the praecipe for discontinuance which provided:

In light of the ongoing appeal currently pending in the Superior Court of Pennsylvania at Docket No. 275 MDA 2001, with argument scheduled on December 12, 2001, please strike the Praecipe for Discontinuance filed on November 15, 2001, by counsel for Plaintiff. Please mark the above-captioned litigation re-opened upon Praecipe of Defendant Geisinger Clinic.

¶ 9 Notwithstanding the intractability and blatant gamesmanship of the attorneys involved which has created a need for appellate resolution of an issue where perhaps the conduct of collegiality and compromise could resolve the matter without resort to judicial resources, the issue regarding the propriety of the trial court's denial of the confidentiality request is now ripe for appellate review.

 ¶ 10 As an initial matter, we consider appellee's request for quashal which is based on the contention that the order appealed from is not separable from and collateral to the main cause of action but is an interlocutory order. After careful re-view, we disagree and conclude that the appeal is properly before us.

An appeal may be taken only from a final order unless otherwise permitted by statute or rule. A final order is ordinarily one which ends the litigation or disposes of the entire case; however, "[a]n appeal may be taken as of right from a collateral order of an administrative agency or court." Pa.R.A.P. 313(a). A collateral order is defined under Pa. R.A.P. 313(b) as "an order separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost." *Ben v. Schwartz*, 556 Pa. 475, 729 A.2d 547, 550 (1999) (footnote omitted).

¶ 11 In *Schwartz*, our supreme court determined that an appeal from an order compelling the production of an investigative file of the defendant dentist in a malpractice action held by the Bureau of Professional and Occupational Affairs which the Bureau claimed was privileged, was an appealable collateral order under Rule 313. The court considered three prongs in its analysis; 1) whether the order was separable from the main cause of action, 2) whether the right involved was too important to be denied review and 3) whether the claim would be irreparably lost should review be denied. *Id.*

¶ 12 The court concluded that the issue of privilege was separable from the main cause of action because it could be addressed without analysis of the alleged negligence of the treating dentists. *Id.* at 552. The court then addressed the "importance" prong and conducted a balancing test: the nature of the potentially

---

4. We deny appellants' motions for sanctions against appellee's counsel and to strike appel-lee's responsorial letter brief.

unprotected right versus the competing efficiency interest advanced by adherence to the final judgment rule. The court concluded that resolution of the issue of whether the file was privileged implicated public policy rights which tipped the balance in favor of immediate appellate review. *Id.* Lastly, the court concluded that potentially irreparable loss was shown because if the file were produced and its contents disclosed, "subsequent appellate review would be moot. In essence, the disclosure of documents cannot be undone." *Id.*

¶ 13 Here, as in *Schwartz*, the order is clearly separable since the confidentiality of the documents at issue may be addressed without analysis of the alleged negligence of the physicians or the liability of the HMO. This is particularly the case since the claims regarding managed care and physicians' compensation have been dismissed via stipulation of the parties. Moreover, the right to confidentiality in matters involving proprietary and trade secrets is rooted in public policy and impacts on individuals and entities other than those involved in the current litigation. Thus, we conclude the scale tips toward the right to review when balanced against the competing interest of judicial efficiency. Moreover, it appears that the only issue unresolved in this "re-opened" litigation is the dispute over the confidentiality of the documents produced during discovery. Finally, there is no question that if the documents which have been disclosed to the plaintiff are in turn disseminated by plaintiff's attorney to other individuals and entities, appellate review of the issue will be moot because such dissemination cannot be undone. We conclude the order appealed from is properly before us and we turn now to appellants' claims:

1. WHETHER THE FINANCIAL AND OTHER CONFIDENTIAL AND PROPRIETARY DOCUMENTS PRODUCED BY APPELLANTS DURING DISCOVERY ARE ENTITLED TO PROTECTION AS TRADE SECRETS?

2. WHETHER THE FINANCIAL AND OTHER DOCUMENTS PRODUCED BY APPELLANTS DURING DISCOVERY ARE ENTITLED TO PROTECTION BASED UPON A CONSTITUTIONAL RIGHT TO PRIVACY?

3. WHETHER THE FINANCIAL AND OTHER DOCUMENTS PRODUCED BY APPELLANTS DURING DISCOVERY ARE ENTITLED TO PROTECTION SINCE THEY ARE NOW IRRELEVANT TO ANY OF THE CLAIMS STILL PENDING IN THIS ACTION?

¶ 14 Our review of the record shows that there are 108 pages of documents which appellants produced but claim are confidential information, the disclosure of which would reveal closely-held trade secrets. We have carefully reviewed each page of each document. The documents contain the HMO's compensation plans and procedures for its physicians and clinical staff as well as detailed salary histories of various individual physicians and financial data for various clinical departments including financial statistics and breakdowns used for in-house evaluative and planning purposes. The documents describe various allocation model pools, and results sharing pools and the formulas by which work effort and performance are quantified for distribution of compensation. Profit and loss margins based on work-unit performance are outlined. At least one of these documents has emblazoned across the top of its first page in large bold typeface *"CONFIDENTIAL PROPRIETARY INFORMATION."*

¶ 15 After careful review, we conclude that all 108 pages contain confidential information in the nature of trade secrets and that the court erred in denying appellants' motion which requested

an order preventing appellee from disseminating the information to individuals or entities not involved in the underlying litigation.

The Pennsylvania Supreme Court has adopted the definition of "trade secret" that is set forth in comment b to section 757 of the *Restatement of Torts:*

> "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and gives him an opportunity to obtain an advantage over competitors who do not know or use it."

*Felmlee v. Lockett,* 466 Pa. 1, 9, 351 A.2d 273, 277 (1976), quoting *Restatement of Torts* § 757 cmt. b; *Van Products Co. v. General Welding and Fabricating Co.,* 419 Pa. 248, 258–59, 213 A.2d 769, 775 (1965). Some factors that a court may consider in determining whether information qualifies as a trade secret include:

> (1) the extent to which the information is known outside the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be acquired or duplicated by others.

*Tyson Metal Products, Inc. v. McCann,* 376 Pa.Super. 461, 465, 546 A.2d 119, 121 (1988), quoting *SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1266 (3d Cir.1985).

*Christopher M's Hand Poured Fudge, Inc. v. Hennon,* 699 A.2d 1272, 1274–75 (Pa.Super.1997).

¶ 16 We have conducted our review of the challenged documents with the above-enumerated factors well in mind. With respect to the third factor, there can be no doubt that the HMO has taken steps to guard the secrecy of the information at issue. One of the documents, labeled as "proprietary" and "confidential" on its face, is a lengthy report which, among other things, describes and defines the methods by which physician compensation is computed and distributed as a percentage of total revenue. Other documents appear to be stamped "confidential" as well and clearly, the HMO has undertaken legal measures and incurred expenses in its attempt to prevent disclosure of the documents and to keep their secrecy intact.

¶ 17 Regarding the fourth enumerated factor, we conclude that the documents contain information of great value to appellant HMO which would also be of great value to its competitors. The documents contain detailed financial statistics for hundreds of individual physicians and physicians' groups which lists and compares the revenue they generate versus the costs they expend. In short, the documents reveal the relative economic productivity of the HMO's physicians. Surely such information would be valuable to a competing managed care company seeking to recruit physicians to its employ.

¶ 18 With respect to the first and second enumerated factors, appellant HMO maintains that the information at issue is not known outside its business. Given the secrecy with which the information has been held and the measures taken to guard that secrecy which have been demonstrably shown, we conclude that, with the exception of certain financial information required to be reported annually to the Pennsylvania Insurance Commissioner

pursuant to the Health Maintenance Organization Act, 40 Pa.C.S.A. §§ 1551–1567, the information at issue is not known outside Geisinger's business. It appears that Geisinger's participating physicians are aware, generally, of the parameters of the compensation plan as it pertains to individual incentives, however, that information is not disclosed, nor required to be disclosed to the general public. *See Horvath v. Keystone Health Plan East, Inc.*, No. 00–0416, 2002 WL 265023, 2002 U.S.Dist. LEXIS 3042 (February 22, 2002) (U.S. district court for eastern district of Pennsylvania held that failure of an HMO to disclose information to an insured regarding the HMO's physician compensation plan, including the use of physician incentives, is not a breach of fiduciary duty under ERISA).

¶ 19 Regarding the fifth factor, the record does not reveal the specific costs and time Geisinger expended in developing the information, however, the sixth factor, *i.e.*, the difficulty of acquisition or duplication of the information by persons or entities outside the business has been clearly shown by the circumstances and essential nature of the instant litigation.

¶ 20 In sum, we conclude that the documents contain formulas and compilations of data and information which unmistakably reflect their intended secrecy and value to the HMO and that the information could create a competitive disadvantage for the HMO if disclosed to other managed care companies or the public. Moreover, the HMO has clearly taken numerous measures to safeguard the information and has closely held the information to itself. We conclude that the subject documents are confidential and must remain so. In so deciding, we make no judgment or finding as to the discoverability, confidentiality or protection of the documents which might be raised in any unrelated lawsuits to which appellants might be a named party.

¶ 21 Given our disposition of appellants' first issue, we need not consider the alternative bases for relief suggested, *i.e.*, that the information is protected by appellants' claimed constitutional right to privacy or that the information is protected because it is no longer germane to the issues raised in the lawsuit.

¶ 22 The order appealed from is reversed. The case is remanded to the trial court for entry of an order of confidentiality to prevent dissemination of the information at issue.

¶ 23 Order reversed. Case remanded. Jurisdiction relinquished.

¶ 24 Judge Beck files a dissenting opinion.

Dissenting opinion by BECK, J.

¶ 1 I respectfully dissent. Although the records in question arguably fall into the definition of a trade secret, I believe that based on policy reasons appellants should not be entitled to an order of confidentiality.

¶ 2 HMOs are complex businesses. In the instant case, if the business involved were a corporation making widgets or one selling storm windows I would agree with the majority's analysis. But the business of the HMO is different. It delivers health care services, vital and necessary to the well being of all citizens. Therefore I view the majority's public policy analysis as too narrow. What price does the general public pay to protect the confidentiality of the internal operation of an HMO? Is safeguarding the secrets of appellants internal operation, the revelation of which might possibly give another HMO an economic advantage, more important than our citizens' need to know about the internal operation?

¶ 3 Information regarding an HMO's managed care procedures, including the

compensation of participating physicians, salary/bonus incentive procedures, and the hiring and retention polices should be made available to the public whether for litigation or other purposes. All of the foregoing is material information that may affect a patient's health care interests. I believe that a patient has a need to know that an HMO is offering financial incentives that can affect a doctor's medical judgment by penalizing doctors for authorizing too many referrals and rewarding them financially by withholding specialized care. Health care decisions involve matters of life and death. A patient relies on a doctor's advice about his or her treatment and should know whether such advice is influenced by self-serving financial considerations created by the HMO. I believe a patient has an interest in making an informed choice about his health care choices, and that such an interest trumps the HMO's interest in protecting the confidentiality of the documents at issue in this case. Accordingly, I dissent.