J-A17005-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| WOLFINGTON BODY COMPANY, INC. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| BRIAN O'NEILL AND GRECH | : | |
| MOTORS, INC. | : | |
| | : | |
| Appellees | : | No. 67 EDA 2017 |

Appeal from the Order Entered December 22, 2016
In the Court of Common Pleas of Chester County
Civil Division at No(s): 2016-10934

BEFORE: GANTMAN, P.J., RANSOM, J., and PLATT, J.*

MEMORANDUM BY GANTMAN, P.J.: **FILED APRIL 30, 2018**

Appellant, Wolfington Body Company, Inc. ("Wolfington"), appeals from the order entered in the Chester County Court of Common Pleas, which denied Appellant's expedited petition for a preliminary injunction against Appellees, Brian O'Neill and Grech Motors, Inc. ("Grech"). We affirm.

The relevant facts and procedural history of this case are as follows. Wolfington is a bus sales company that provides specialized transportation. In October 2013, Wolfington hired Mr. O'Neill as a commercial vehicle salesperson. On October 9, 2013, Mr. O'Neill executed an employment agreement ("Employment Agreement"), which contained several restrictive covenants. The Employment Agreement provides, in pertinent part:

> 8. <u>Non-Compete and Non-Solicitation Covenants</u>. The Employee agrees that during the Term of this Agreement and for a period of two (2) years thereafter:

_____

*Retired Senior Judge assigned to the Superior Court.

a. <u>Non-Compete</u>. The Employee will not directly or indirectly, on his own behalf or in the service or on behalf of others, as owner, principal, stockholder, director, employee, officer, consultant, agent, independent contractor, partner, joint-venture or in any other manner, engage in any activity in competition with any of the activities carried on by the Company (or any affiliate thereof) in any state within the United States in which the Company (or any affiliate thereof) then conducts any business or has conducted any business (whether during the Term or any period preceding the Term);

b. <u>Customer Solicitation</u>. The Employee will not, without the prior written consent of the Company, directly or indirectly solicit any account or customer with whom the Company (or any affiliate thereof) has conducted any business or for whom the Company (or any affiliate thereof) has performed any services or sold any products (whether during the Term or any period preceding the Term); nor will the Employee directly or indirectly solicit any person or entity who was a potential account or customer of the Company (or any affiliate thereof) as a result of contacts (including without limitation the transmittal of proposals) having been made between the Company (or any affiliate thereof) and such person or entity within one (1) year prior to the termination of this Agreement. …

\* \* \*

9. <u>Confidential Information</u>.

a. <u>Non-Disclosure</u>. The Employee covenants and agrees that he will treat as confidential and will not, without the prior written approval of the Company, use (other than in the performance of his duties hereunder) or disclose in any manner, either during the Term o[r] any time thereafter after the termination of this Agreement, any "Confidential Information" (as hereinafter defined) of the Company or any affiliate thereof. The Employee also agrees that during the Term and thereafter, he will diligently protect any Confidential Information against loss by inadvertent or unauthorized disclosure and will comply

with all policies established by the Company for the purpose of protecting such information. All Confidential Information prepared by the Employee or which otherwise shall be disclosed to or come into the possession of the Employee, shall be and remain the sole and exclusive property of the Company. The Employee agrees that upon termination of this Agreement, or at any other prior time upon request, he will promptly deliver to the Company the originals and all copies of any Confidential Information that are then in his possession, custody or control.

b. Definition. For purposes of this Agreement, "Confidential Information" means any and all data and all information relating to the Company or any affiliate thereof or its affairs, including but not limited to information relating to the financial affairs, plans, processes, services, actual or prospective providers, suppliers or customers, customer lists, pricing information, technological information, manuals (including service manuals), patents, processes, provider contracts, trade secrets, the Employee's or another person's compensation, research or accounting of the Company or any affiliate thereof, which data and information is disclosed to the Employee or known to the Employee as a consequence of the Employee's employment hereunder. "Confidential Information" shall also include any such data or information provided to the Company by a third party and required to be kept in confidence by the Company.

(Employment Agreement, dated October 9, 2013, at 2-4; R.R. at 24a-26a).

On October 24, 2016, Mr. O'Neill submitted a letter of resignation to Wolfington. During an exit interview, Wolfington reminded Mr. O'Neill of the restrictive covenants contained in the Employment Agreement. In early November 2016, Mr. O'Neill began employment with Grech, a bus manufacturer for the high-end luxury market, as a Senior Sales Executive.

On November 17, 2016, Wolfington filed a complaint against Mr. O'Neill and Grech, claiming Mr. O'Neill was in violation of the restrictive

covenants contained in his Employment Agreement because Grech was a competitor of Wolfington. Specifically, Wolfington alleged, *inter alia*, that it hired Mr. O'Neill in October 2013, as a commercial vehicle salesperson for the Mid-Atlantic region—New York south through Maryland and east to and through New Jersey and Delaware. Wolfington averred it had provided Mr. O'Neill access to its confidential, proprietary, and/or trade secret information during the course of Mr. O'Neill's employment; the restrictive covenants in the Employment Agreement are reasonable in scope and do not impose greater restrictions than necessary to protect Wolfington's legitimate business interests; Mr. O'Neill resigned on October 24, 2016, and began working for Grech in early November 2016; and Grech is one of Wolfington's competitors, specifically in Pennsylvania, New Jersey, Delaware, and Maryland. Wolfington sought, *inter alia*, an injunction prohibiting Mr. O'Neill: (1) from working for Grech or any other competitor for two years from the date of Mr. O'Neill's resignation from Wolfington; (2) from attempting to solicit or interfere with any of Wolfington's past, present, or prospective customers; and (3) prohibiting Mr. O'Neill from disclosing any of Wolfington's confidential, proprietary, or trade secret information. Wolfington also sought an injunction against Grech prohibiting Grech from attempting to solicit or interfere with any of Wolfington's past, present, or prospective customers, and restraining Grech from disclosing or using any of Wolfington's confidential, proprietary, or trade secret information.

On November 18, 2016, Wolfington filed an expedited petition for preliminary injunction and supporting memorandum of law. Wolfington claimed it would suffer immediate, substantial, and irreparable harm if Mr. O'Neill and Grech continue to violate the terms of Mr. O'Neill's Employment Agreement. Wolfington sought an order granting preliminary injunctive relief and requiring Mr. O'Neill to oblige the restrictive covenants contained in the Employment Agreement. On December 7, 2016, Mr. O'Neill and Grech filed answers to Wolfington's complaint, and the expedited petition for preliminary injunction, with new matter challenging, among other things, the restrictive covenant as unreasonable, both temporally and geographically, and unenforceable as against public policy.

The parties proceeded to a hearing on the petition for preliminary injunction on December 14-15, 2016. Richard Wolfington, Jr., the President of Wolfington, testified, *inter alia*, Wolfington is a bus sales company that provides specialized transportation throughout the Mid-Atlantic region and the whole country. Mr. Wolfington explained the company has sold buses in numerous states including, but not limited to, Pennsylvania, New Jersey, New York, Delaware, Maryland, Virginia, Georgia, Florida, Wisconsin, and Hawaii. Mr. Wolfington said the company required Mr. O'Neill to sign the Employment Agreement contemporaneously with the start of his employment, because Mr. O'Neill would be privy to pricing information, customer lists, and other important information in his role, and the

restrictive covenants were intended to protect Wolfington from unwarranted disclosure of that information to a competitor. Mr. Wolfington explained the company keeps its information on secured, password-protected servers. Mr. Wolfington described Mr. O'Neill's general territory as northeastern Pennsylvania, New Jersey, New York, and Maryland. (*See* N.T. Hearing, 12/14/16, at 29-80; R.R. at 112a-163a.)

Mr. O'Neill testified, *inter alia*, he is currently the Senior Sales Executive for Grech in livery (luxury bus) sales. Mr. O'Neill said his territory at Wolfington was limited to Philadelphia and New Jersey. Prior to his employment with Wolfington, Mr. O'Neill worked for another bus company called Don Brown Bus Sales as a regional sales manager. Mr. O'Neill also previously worked for MTG Incorporated, a national wholesale provider of limousine parts and accessories in the coach industry. Based on his total employment history over many years, Mr. O'Neill explained, he has established a large customer base. Mr. O'Neill said he kept a list of his customers' birthdays, anniversaries, home addresses, kids' names, etc. Mr. O'Neill testified that his lengthy employment history gave him extensive knowledge of the industry and access to numerous "build sheets," which are the price sheet cost matrices, which manufacturers use to assemble the prices of products. Mr. O'Neill discussed his employment at Wolfington and frustrations working for that company. Mr. O'Neill insisted he returned all "confidential" information belonging to Wolfington upon his departure and

did not retain any of Wolfington's information. Mr. O'Neill denied that Grech is a competitor of Wolfington. Mr. O'Neill also denied that he had provided Grech with a list of Wolfington's customers. Mr. O'Neill explained he would suffer immense financial harm if the court enforced the provisions of the Employment Agreement and prohibited him from working in the bus sales industry for two years. (*See id.* at 82-139; R.R. at 165a-222a); (*See also* N.T. Hearing, 12/15/16, at 55-95; R.R. at 279a-319a).

Edward Grech, testified, *inter alia*, he is the President of Grech, which manufacturers buses for the high-end luxury market. Mr. Grech explained that when he learned of the restrictive covenants contained in Mr. O'Neill's Employment Agreement with Wolfington, Mr. Grech instructed Mr. O'Neill to return all of Wolfington's information including computers, customer lists, cell phones, etc. Mr. Grech said Mr. O'Neill confirmed he had returned all of Wolfington's information. (*See id.* at 5-23; 95-108; R.R. at 229a-247a; 319a-332a).

Brian Engle, Wolfington's Vice President of Sales, testified, *inter alia*, he was Mr. O'Neill's direct supervisor when Mr. O'Neill worked at Wolfington. Mr. Engle said Wolfington hired Mr. O'Neill to cover New Jersey, Philadelphia, and the northeastern Pennsylvania counties. Mr. Engle explained Mr. O'Neill had access to all price books, products, and manufacturers represented by Wolfington. Mr. Engle testified Mr. O'Neill had access to Wolfington's price margins, internal structures, and creative financing tools. Mr. Engle also

discussed Wolfington's customer list, which contains Wolfington's past, current, and prospective customers. Mr. Engle admitted some of the information on the customer list is available publicly through association memberships. Mr. Engle emphasized its pricing information is not available publicly, and Wolfington considers its pricing information confidential. Mr. Engle maintained Grech is a competitor of Wolfington because its sells similar products in the same market. (**See id.** at 23-50; R.R. at 247a-274a). At the conclusion of the hearing, the court took the matter under advisement.

The court denied Wolfington's petition for injunctive relief on December 22, 2016. Wolfington timely filed a notice of appeal the next day.[1] On January 3, 2017, the court ordered Wolfington to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Wolfington timely complied on January 19, 2017.

Wolfington raises the following issues for our review:

> WHETHER THE TRIAL COURT ERRED BY NOT ENFORCING THE POST-EMPLOYMENT NON-COMPETITION COVENANT AND NON-SOLICITATION COVENANT WHERE WOLFINGTON PROVED THE EXISTENCE OF LEGITIMATE BUSINESS INTERESTS THAT THE NON-COMPETITION AGREEMENT WAS INTENDED TO PROTECT.
>
> WHETHER THE TRIAL COURT ERRED BY REQUIRING

---

[1] **See** Pa.R.A.P. 311(a)(4) (explaining appeal may be taken as of right and without reference to Rule 341(c) from order that grants or denies injunction).

[WOLFINGTON] TO ESTABLISH THE EXISTENCE OF A TRADE SECRET AS A CONDITION PRECEDENT TO WOLFINGTON'S ABILITY TO ENFORCE THE POST-EMPLOYMENT NON-COMPETITION AGREEMENT, THE NON-SOLICITATION AGREEMENT, AND THE NON-USE OF CONFIDENTIAL INFORMATION CLAUSES OF THE EMPLOYMENT AGREEMENT WHERE [WOLFINGTON] DID NOT ASSERT A CAUSE OF ACTION UNDER THE PENNSYLVANIA UNIFORM TRADE SECRETS ACT ["PUTSA"] AND REPEATEDLY SO ADVISED THE COURT.

WHETHER THE [TRIAL COURT] ERRED BY FINDING THAT THE GEOGRAPHIC SCOPE OF THE POST-EMPLOYMENT NON-COMPETITION AGREEMENT WAS NOT REASONABLE WHERE [MR.] O'NEILL…DID NOT MEET HIS BURDEN TO ESTABLISH THROUGH COMPETENT EVIDENCE THAT THE RESTRICTIVE COVENANT WAS UNENFORCEABLE AND UNREASONABLE AND PRESENTED NO EVIDENCE OF SUCH ALLEGED UNREASONABLENESS.

WHETHER THE TRIAL COURT ERRED BY REFUSING TO INVOKE THE "BLUE PENCIL" PROVISION OF THE EMPLOYMENT AGREEMENT TO LIMIT THE GEOGRAPHIC SCOPE OF THE POST-EMPLOYMENT NON-COMPETITION COVENANT IF THE TRIAL COURT BELIEVED THAT GEOGRAPHIC SCOPE WAS OVER BROAD.

WHETHER THE TRIAL COURT ERRED BY NOT ENFORCING THE NON-SOLICITATION AND NON-DISCLOSURE/NON-USE OF CONFIDENTIAL INFORMATION COVENANTS CONTAINED IN THE PARTIES' EMPLOYMENT AGREEMENT, REGARDLESS OF THE ENFORCEABILITY OF THE NON-COMPETITION AGREEMENT.

(Wolfington's Brief at 5-6).[2]

Our review of the denial of a preliminary injunction implicates the following principles:

---

[2] For purpose of disposition, we have reordered some of Wolfington's issues.

Our scope of review is plenary. [O]ur [standard of] review of a trial court's order granting or denying preliminary injunctive relief is "highly deferential." This "highly deferential" standard of review states that in reviewing the grant or denial of a preliminary injunction, an appellate court is directed to examine the record to determine if there were any apparently reasonable grounds for the action of the court below.

An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused. [W]e do not inquire into the merits of the controversy[.] Only if it is plain that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied will we interfere with the decision of the trial court.

A trial court has "apparently reasonable grounds" for granting the extraordinary remedy of preliminary injunctive relief if it properly finds that all of the "essential prerequisites" are satisfied.

*Synthes USA Sales, LLC v. Harrison*, 83 A.3d 242, 248-49 (Pa.Super. 2013) (internal citations and some quotation marks omitted).

There are six "essential prerequisites" that a party must establish prior to obtaining preliminary injunctive relief. The party must show: 1) that the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages; 2) that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings; 3) that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct; 4) that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits; 5) that the injunction it seeks is reasonably suited

- 10 -

to abate the offending activity; and, 6) that a preliminary injunction will not adversely affect the public interest. The burden is on the party who requested preliminary injunctive relief[.]

**Warehime v. Warehime**, 580 Pa. 201, 209-10, 860 A.2d 41, 46-47 (2004) (internal citations omitted).

A decision addressing a request for a preliminary injunction thus requires extensive fact-finding by the trial court because the moving party must establish it is likely to prevail on the merits. Simply the moving party must establish a *prima facie* right to relief. If the moving party's right to relief is unclear, then a preliminary injunction should not issue.

**Synthes, supra** at 249-50 (internal citations and footnote omitted). "In the preliminary injunction context, we have further observed that if the evidence supports a trial court's factual finding, we will conclude that there are apparently reasonable grounds for that determination." **Shepherd v. Pittsburgh Glass Works, LLC**, 25 A.3d 1233, 1245 (Pa.Super. 2011).

We combine Wolfington's issues. Wolfington argues it has a legitimate business interest in protecting its "confidential" information, which includes customer lists, pricing information, and marketing strategies. Wolfington asserts its customer lists, pricing information, and marketing strategies are not publicly available, and it restricts access to this information to its sales team. Wolfington maintains it stores its confidential information on password-protected secure company servers. Wolfington admits some of the information regarding its customer lists is publicly available, but Wolfington stresses it compiled both public and non-public information,

which gives Wolfington a competitive edge over other bus dealers and is worthy of protection. Wolfington highlights that it required all employees to execute an agreement acknowledging the confidential nature of Wolfington's pricing information.

Wolfington also complains the trial court improperly required it to prove a claim for relief under PUTSA, even though Wolfington did not assert a cause of action under that statute. Wolfington insists the court required Wolfington to show the existence of a "trade secret" as defined by PUTSA, instead of applying common law principles regarding enforcement of a non-disclosure covenant, which requires proof of only a protectable business interest. Even if Wolfington failed to establish a legitimate business interest in its customer lists, pricing information, and marketing strategies, Wolfington claims it has a legitimate business interest in the goodwill Mr. O'Neill developed with customers on behalf of Wolfington. Wolfington highlights Mr. O'Neill's significant and direct personal contacts with Wolfington's customers, which is the "number one selling factor" in the bus industry. Wolfington submits the court completely ignored Wolfington's customer goodwill as a legitimate business interest. Wolfington suggests Mr. O'Neill has a common law duty to protect and not profit from the use of an employer's confidential information, even in the absence of an express non-disclosure agreement. Wolfington insists Mr. O'Neill violated the non-disclosure covenant and his common law duties to Wolfington by providing

Grech with a list of customers whom Mr. O'Neill sold buses to while employed at Wolfington, in addition to soliciting one of Wolfington's customers while employed at Grech.

Wolfington further argues Mr. O'Neill failed to present any evidence to support his claim that the non-compete covenant was unreasonable. Wolfington claims the court based its decision not to enforce the non-compete provision on its erroneous belief that Wolfington has done business in 35 states. Wolfington maintains the non-compete covenant prohibits Mr. O'Neill from working for a competing business in only about 17 states.[3] Wolfington insists a non-compete covenant restricting Mr. O'Neill from competing in 17 states is reasonable, given the scope of Mr. O'Neill's job duties at Wolfington. Even if the non-compete covenant is unreasonable in scope, Wolfington insists the trial court should have applied the "blue pencil" rule to narrow the geographic scope of the non-compete covenant. At a minimum, Wolfington contends the court should have applied the non-compete provision to Mr. O'Neill's prior sales territories—Pennsylvania, New Jersey, Maryland, Delaware, and New York. Wolfington concludes the trial court erred when it denied injunctive relief, and this Court should reverse and enforce all of the restrictive covenants in the Employment Agreement. We disagree.

_____

[3] In its reply brief, Wolfington contends the non-compete covenant prohibits Mr. O'Neill from working in 15 states.

"Pennsylvania courts have historically been reluctant to enforce contracts that place restraints on trade or on the ability of an individual to earn a living; however, post-employment non-competition covenants are not *per se* unreasonable or unenforceable." **WellSpan Health v. Bayliss**, 869 A.2d 990, 996 (Pa.Super. 2005). Importantly:

> At a minimum, for a non-competition or restrictive covenant to be enforceable, it must be reasonably related to the protection of a legitimate business interest. The type of interests that have been recognized in the context of a non-competition covenant include trade secrets or confidential information, unique or extraordinary skills, customer good will, and investments in an employee specialized training program. In contrast, a post-employment covenant that merely seeks to eliminate competition *per se* to give the employer an economic advantage is generally not enforceable.

**Id.** at 996-97 (internal citations and quotation marks omitted). The presence of a legitimate, protectable business interest is a threshold requirement for an enforceable restrictive covenant. **Hess v. Gebhard & Co. Inc.**, 570 Pa. 148, 163, 808 A.2d 912, 920 (2002).

In general, a "trade secret" is any "compilation of information which is used in one's business that gives one an opportunity to obtain an advantage over competitors." **WellSpan, supra** at 997. Factors a court may consider in determining whether information qualifies as a trade secret include:[4]

---

[4] Historically, Pennsylvania adopted the definition of "trade secrets" set forth in the Restatement (Second) of Torts § 757. Trade secret law is now codified at 12 Pa.C.S.A. § 5301-5308, as part of PUTSA.

> (1) the extent to which the information is known outside the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be acquired or duplicated by others.

*Omicron Systems, Inc. v. Weiner*, 860 A.2d 554, 562 (Pa.Super. 2004) (quoting *Dibble v. Penn State Geisinger Clinic, Inc.*, 806 A.2d 866, 871 (Pa.Super. 2002), *appeal denied*, 573 Pa. 666, 820 A.2d 705 (2003)).

"The crucial indicia for determining whether certain information constitutes a trade secret are substantial secrecy and competitive value to the owner." *O.D. Anderson, Inc. v. Cricks*, 815 A.2d 1063, 1070 (Pa.Super. 2003) (internal citation and quotation marks omitted). The question of whether information is a trade secret must be made on a case-by-case basis. *Id.* at 1071. "A trade secret does not include an employee's aptitude, skill, dexterity, manual and mental ability, or other subjective knowledge. In addition, if a competitor could obtain the information by legitimate means, it will not be given injunctive protection as a trade secret." *WellSpan Health, supra* at 997.

"[U]nder certain circumstances, customer lists and customer data may be entitled to protection as trade secrets." *Iron Age Corp. v. Dvorak*, 880 A.2d 657, 663 (Pa.Super. 2005). *See, e.g., Wellspan Health, supra* at 998-99 (holding healthcare system's patient referral base, which required

substantial investments to generate, constituted legitimate, protectable business interest; without legal recognition as protected interest, referral bases of institutions, which provide highly specialized medical care could erode, causing serious harm not only to clinical care and to physician training and research programs, all of which benefit public). **Compare Hess, supra** (holding insurance firm failed to show its prices and customer lists were unique to its business and deserved protection as trade secrets **or confidential information**; potential customers available to insurance firm were available to any other insurance agency operating in same county and identities of potential clients were widely known and easily available; because information insurance firm sought to keep confidential can be obtained by legitimate means by its competitors, enforcement of restrictive covenant on that basis is inappropriate); **Renee Beauty Salons, Inc. v. Blose-Venable**, 652 A.2d 1345, 1349-50 (Pa.Super. 1995), *appeal denied*, 541 Pa. 627, 661 A.2d 874 (1995) (holding hair stylists' compilation of client record cards containing customers' names, telephone numbers, hair styling preferences, *etc*., did not constitute trade secret warranting injunctive relief, where such information was easily ascertainable through other sources).

Goodwill is essentially "the positive reputation that a particular business enjoys." **Hess, supra** at 165, 808 A.2d at 922. "Goodwill represents a preexisting relationship arising from a continuous course of business which is expected to continue indefinitely." **WellSpan, supra** at

997.

Once the threshold requirement of a protectable business interest is met:

> [T]he next step in analysis of a non-competition covenant is to apply the [requisite] balancing test…. First, the court balances the employer's protectable business interest against the employee's interest in earning a living. Then, the court balances the employer and employee interests with the interests of the public.
>
> In weighing the competing interests of employer and employee, the court must engage in an analysis of reasonableness. First, the covenant must be reasonably necessary for the protection of the employer. In addition, the temporal and geographical restrictions imposed on the ex-employee must be reasonably limited. The determination of reasonableness is a factual one, requiring consideration of all the facts and circumstances, with the party claiming unreasonableness as a defense against enforcement of the covenant bearing the burden of proof.

**WellSpan, supra** at 999 (internal citations omitted). "Generally, our determination of reasonableness of time and territory has involved a weighing of competing interests—that of the employer's need for protection—against the hardship of the restriction to be imposed upon the employee." **Insulation Corp. of America v. Brobston**, 667 A.2d 729, 734 (Pa.Super. 1995).

Where a covenant not to compete is overly broad, courts have discretion to grant enforcement limited to those portions of the restrictions which are reasonably necessary to protect the employer. **Hess, supra** at 162-63, 808 A.2d at 920. **See also Reading Aviation Service, Inc.**, 454

Pa. 488, 311 A.2d 628 (declining partial enforcement of non-compete covenant due to policy concern that courts should refrain from rewriting agreements, which could encourage employers to draft unreasonable restrictions knowing court can later enforce agreement, at least in part, by reforming restrictive covenant); *WellSpan, supra* (discussing court's authority to "blue pencil" or "blue-line" unreasonable restrictive covenant).

Instantly, the trial court decided Wolfington had failed to establish a protectable legitimate business interest, reasoning:

> Here, I found that the skills and information necessary to enable an experienced salesperson such as [Mr.] O'Neill are readily available in the public domain. Such information includes names and addresses of customers or potential customers of commercial transportation vehicles and competitive pricing of these products. There was no information that amounts to an actual secret, was of peculiar importance to Wolfington, or constituted a competitive value; rather, the information was common knowledge throughout the industry. There is simply nothing unusual or new about the pricing of luxury commercial vehicles, the profit margins of the largest commercial vehicle companies, or their customers or prospective customers. Having no experience in the luxury bus industry, if I were thrust into a sales position for Wolfington or Grech, I would expect to target retirement homes, casinos, hotels, and colleges as a starting point. This is based on common sense, not derived from specialized skills or training or confidential proprietary information. …
>
> Further, the definition of "Confidential Information" as set forth in the Employment Agreement was so broad as to include any information [Mr.] O'Neill may have learned during his employment with Wolfington. There was no plausible way to distinguish such knowledge and information one acquires with experience and that which amounts to true confidential information deserving of

- 18 -

protection. As set forth in more detail below, the restrictive covenants were not reasonably tailored to protect Wolfington's business interests. The Agreement's definition of "Confidential Information" was excessively broad and effectively prohibited [Mr.] O'Neill from engaging in his chosen profession. As a result, the customer lists, costs and pricing margins, and marketing strategies are neither protectable as trade secrets nor do they amount to actual confidential information. This conclusion was neither based on palpably erroneous law nor the misapplication of the law.

\* \* \*

Here, Wolfington failed to establish [the] threshold requirement. Wolfington did not prove the existence of a legitimate business interest in the information it sought to protect. On page 11 of my December 22, 2016 Opinion [in support of denying injunctive relief], I inadvertently misused the term "legitimate business interest", using it to mean that I understood why Wolfington would desire to keep this information out of the hands of its competitors to the extent possible. However, the remainder of my Opinion explains why I determined that the information did not amount to a trade secret or confidential information as it was already common through the livery industry.

Although the establishment of legitimate business interests is necessary to enforce a restrictive covenant, it is not the only requirement. The restrictive covenant must be reasonably tailored to protect the employer's interests. Based upon evidence at the hearing, I concluded that Wolfington failed to establish that the restrictive covenants of the Employment Agreement were reasonably tailored, even if Wolfington indeed had proved a legitimate business interest in protecting its costs and pricing margins, customer lists, and marketing strategies. …

In my analysis, I balanced the employer's [purported] protectable business interests against the interest of the employee in earning a living in his…chosen profession, trade or occupation, and thereafter balanced those competing interests against the interest of the public. In doing so, I concluded that Wolfington's interests in

- 19 -

protecting its customer lists, costs, and pricing margins, and marketing strategies were not legitimate business interests. Further, these interests were not outweighed by [Mr.] O'Neill's right to earn a living in his chosen field. This is because such information was already widely disseminated within the luxury bus industry. Further, it is within the interest of the public to have competitive pricing available for commercial vehicles. Because Wolfington failed to establish a legitimate business interest and, even had Wolfington proven a legitimate business interest, the restrictive covenants were not reasonably tailored to protect such interests, said restrictive covenants were unenforceable. This conclusion was neither based on palpably erroneous law nor the misapplication of the law.

*     *     *

Wolfington argues that I should have enforced the non-solicitation and non-use of confidential information covenants despite my finding that the non-competition covenant was unenforceable. …

Here, I determined that the information Wolfington sought to protect was common knowledge within the industry and, therefore, did not amount to a legitimate business interest, *i.e.*, trade secret or confidential information. If a competitor could obtain the information by legitimate means, it will not be given injunctive protection as a trade secret. I have belabored this point already herein. Not to diminish the hard work of individuals in sales, but the skills and information necessary to enable an experienced salesperson such as [Mr.] O'Neill are readily available in the public domain. Such information includes names and addresses of customers or potential customers of commercial transportation vehicles and competitive pricing of these products. Simply stated, the luxury bus industry is not the type of field which requires highly specialized skills or technical details requiring protection, unlike for example, the pyrotechnic industry.

Moreover, testimony demonstrated that Wolfington and Grech previously targeted and continue to target the same customers on a consistent basis, dating back to before [Mr.] O'Neill joined Grech. According to Wolfington, [Mr.]

O'Neill had lost sales to Grech in the past and conversely has won sales away from Grech while employed with Wolfington. Both companies attend the same trade association conventions, set up booths for marketing purposes and use the events to target the same or similar customers. Thus, the information Wolfington seeks to protect was already subject to discovery by legitimate means. Under the law, such information is not entitled to injunctive protection. This conclusion was neither based on palpably erroneous law nor the misapplication of the law.

(Trial Court Opinion, filed February 14, 2017, at 11-15) (internal citations and quotation marks omitted).[5] We see no reason to disrupt the court's decision to deny the injunction, where Wolfington failed to satisfy the "threshold" requirement to establish a legitimate business interest worthy of protection.[6] *See Hess, supra*; *WellSpan, supra*; *Renee Beauty Salons, Inc*. *See also Synthes, supra*.

Regarding Wolfington's complaint that the court improperly required it to establish a "trade secret" as defined in PUTSA, the trial court explained: "Although I looked to PUTSA for guidance on the definition of 'trade secret,' I ultimately concluded that the information Wolfington sought to protect was neither a trade secret (as defined by PUTSA) **nor did it amount to**

---

[5] The trial court's Rule 1925(a) opinion does not appear in the reproduced record.

[6] The court did not expressly address Wolfington's claim that it has a legitimate business interest in its customer goodwill. Even if Wolfington could succeed on this claim, the restrictive covenants still fail the requisite balancing test.

- 21 -

**confidential information**, deserving of injunctive protection." (Trial Court

Opinion at 10) (emphasis added). Further, Wolfington repeatedly claimed it

was seeking an injunction to protect its "trade secrets" throughout its

complaint and petition for injunctive relief. (*See* Complaint, filed 11/17/16,

at ¶¶ 1, 8, 9, 11, 23, 33-34, 53(c), 58, 60(c), 65, 65(c); R.R. at 6a-8a, 11a,

13a, 17a-18a, 20a); (Memorandum of Law in Support of Wolfington's Motion

for Preliminary Injunction, filed 11/18/16, at 2, 4, 6-7, 10, 12, 14-15; R.R.

at 61a, 63a, 65a-66a, 69a, 71a, 73a-74a). Thus, notwithstanding

Wolfington's assertion at the injunction hearing and now on appeal that it did

not assert a cause of action under PUTSA, it was certainly reasonable for the

trial court to consider whether any of the information Wolfington sought to

protect was worthy of trade secret protection, based on the allegations in

Wolfington's pleadings.[7]

Moreover, even if Wolfington had established a legitimate business

interest, the trial court decided Wolfington was still not entitled to injunctive

relief, explaining:

> The non-compete covenant restricts [Mr.] O'Neill from
> directly or indirectly, on his own behalf or in the service or
> on behalf of others engag[ing] in any activity in
> competition with any of the activities carried on by

---

[7] In fact, the introduction paragraph of Wolfington's complaint alleges: "This case involves a concerted effort by a direct competitor of [Wolfington], Grech, to steal Wolfington's customers and accounts, and to misappropriate Wolfington's confidential, proprietary, and trade secret information…" (Complaint at ¶ 1; R.R. at 6a).

Wolfington (or any affiliate) **in any state within the United States in which Wolfington** (or any affiliate thereof) conducts any business or have conducted any business. Evidence at the hearing showed that [Mr.] O'Neill was responsible for the territory of New York south through Maryland and New Jersey, west through Delaware and Eastern Pennsylvania. Thus, the restriction does not apply merely to [Mr.] O'Neill's former sales territory (PA, DE, NJ, NY, MD), but to **any state** in which Wolfington **has ever done** business. The effect of this clause is significantly more broad and drastic than would initially appear. At the hearing, testimony revealed that Wolfington, as one of the largest bus dealers in the country, has done business in 35 states. Because this geographic restraint far exceeds the scope of [Mr.] O'Neill's sales territory at Wolfington, it is unreasonable under the law.

My finding that the geographic restraint was unreasonable was based upon competent evidence at the hearing of the limited scope of [Mr.] O'Neill's sales territory when compared to the restrictive covenant's scope of 35 states across the county. Such a restriction effectively prohibits [Mr.] O'Neill from earning a living in his chosen field for a period of two years. …

\*    \*    \*

Wolfington argues that this court should have invoked the "blue pencil" provision of the Employment Agreement to limit the geographical scope of the non-competition covenant. …

\*    \*    \*

Here, as written, the restrictive covenant prevented [Mr.] O'Neill from engaging in his chosen profession in more than two-thirds of the country for two years. Simply stated, this broad restriction is not necessary for the protection of Wolfington's business interests which, as explained herein, are not entitled to injunctive protection due to the nature of the subject information. I do not find equitable considerations compelling in this instance. To invoke the court's power to modify the restrictive covenant

would effectively encourage a policy whereby employers could impose the most broad restraints on an employee as a condition of employment, without consideration for the reasonableness or enforceability of such provisions, resting comfortably on the court's power to modify the agreement if or when the employer sought to enforce the restrictive covenants. Because this Commonwealth disfavors restrictions on trade, it follows that the court should exercise its power to modify a restrictive covenant in only the most deserving of cases. This is not such a case. Thus, I deemed the geographic restraints in the restrictive covenants to be more broad than necessary to protect Wolfington's information and I exercised my discretion in refusing to "blue pencil" the covenant to modify the scope of the geographic restraints. This was not an abuse of discretion.

(Trial Court Opinion at 6-9) (internal citations omitted) (emphasis in original). The record supports the court's decision that the non-compete provision, restricting Mr. O'Neill from working in any state within the United States in which Wolfington conducts business in or has ever conducted business in, is unreasonably broad. (**See** Employment Agreement at 2; R.R. at 24a.) **See also WellSpan, supra**; **Insulation Corp. of America, supra**.

With respect to Wolfington's claim that no evidence supported the trial court's finding that Wolfington conducts or has conducted business in 35 states, it is not apparent from the record where the trial court based that finding. Nevertheless, the record makes clear Wolfington conducted business from June 2012 until the time of the injunction hearing in **at least** 17 states plus the District of Columbia. (**See** Wolfington's Hearing Exhibit P-7; R.R. at 375a-404a); (N.T., 12/14/16, at 37; R.R. at 120a). Even if

Wolfington conducted business in only those 17 states plus the District of Columbia, the non-compete provision is still unreasonably broad when compared to the small territory Mr. O'Neill was assigned to while working at Wolfington. ***See WellSpan, supra***; ***Insulation Corp. of America, supra***.

Concerning Wolfington's claim that the court should have invoked the "blue pencil" provision, Wolfington failed to preserve this claim in its petition for injunctive relief and supporting memorandum of law, and did not raise this issue at the injunction hearing. Thus, this issue is waived. ***See Irwin Union Nat. Bank and Trust Co. v. Famous***, 4 A.3d 1099 (Pa.Super. 2010), *appeal denied*, 610 Pa. 610, 20 A.3d 1212 (2011) (explaining general rule that issues cannot be raised for first time in Rule 1925(b) statement or on appeal). Moreover, the record supports the court's refusal to invoke the "blue pencil" provision. ***See Reading Aviation Service, Inc., supra***. ***See also Synthes, supra***. Therefore, Wolfington's issues on appeal merit no relief. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/30/18

- 25 -